Original
No. LD-90-028

## OTIS' CASE

June 2, 1992

*McLane, Graf, Raulerson & Middleton P.A.*, of Manchester (*David Wolowitz* and *Mark C. Rouvalis* on the brief, and *Mr. Wolowitz* orally), for the committee on professional conduct.

*Upton, Sanders & Smith*, of Concord, and *James D. Otis, pro se*, (*Russell F. Hilliard* on the brief, and *Mr. Hilliard* and *Mr. Otis* orally), for the respondent.

BROCK, C.J.   In December 1990, the Supreme Court Committee on Professional Conduct (committee), in accordance with Supreme Court Rule 37(13), brought a petition to disbar the respondent, Attorney James D. Otis. The committee moved for a suspension of the respondent pending a determination of the disbarment petition, to which the respondent did not object, and he was temporarily suspended from the practice of law. By order of this court, a hearing before a referee (*Maher*, J.) was held. The referee found, by clear and convincing evidence, that Attorney Otis had violated the Rules of Professional Conduct (Rules) 1.7(b), 1.8(b), and 8.4(a).

This case centers on the respondent's improper behavior towards six female clients. Evidence, in the form of affidavits and testimony, from all six women was presented at the hearing before the referee. Pursuant to a protective order issued by this court, the witnesses were referred to by their first name and last initial.

In 1988, Sara B. sought a divorce from her husband, who was allegedly abusing her and two of her four children. The division for children and youth services was investigating her husband for child abuse and Sara B. believed that she would be at risk of losing custody of her children if she allowed her husband to return home.

Upon locating the respondent's name in the yellow pages, Sara B. retained Attorney Otis to represent her. The respondent filed a divorce libel on behalf of Sara B., alleging severe emotional harm and cruelty. Her husband did not make a claim of fault against her.

Sara B. was having financial difficulties, as her husband was not making support payments and she was responsible for the mortgage and taxes on the house as well as living expenses for herself and her four children. She had difficulty meeting these expenses on her own, and she feared losing her home. Rather than suffer foreclosure she preferred to sell the property, but her husband refused to give her legal authority to sell it.

In July 1989, Sara B. began working as the respondent's secretary. In exchange for her work, the respondent agreed to continue representing her at no charge with the understanding that she would do as much work on her case as possible and that she would receive less salary than he would otherwise pay. She continued to work at a full-time second job in an effort to make ends meet.

When Sara B. started working for the respondent, another woman also worked there, but she soon left. Thereafter, the respondent began making inappropriate sexual remarks and jokes to Sara B. He soon began locking the front office door and making overt sexual advances toward her. These events occurred at least twice a week and seemed to arise "almost universally as a result of a phone call from his wife." Sara B. quickly learned never to get caught in a corner and to keep a desk or a chair between them. She found that she could talk him out of these advances by reminding him of his wife. No advances were ever made in front of a third party.

On Friday, November 24, 1989, the day after Thanksgiving, the advances escalated to assault. On that day, a scheduled holiday, Sara B. nevertheless went to the office to close out old files. When she arrived, she was surprised to find the respondent there. His wife called, and after talking with her, he came into the room where Sara B. was working and locked the door. When she tried to get up off the floor from where she was working, the respondent kicked her under the chin, forcing her to fall over backwards. He then picked her up

and, over her objections, carried her to the couch in his office and began to sexually assault her.

Sara B. tried to talk him out of it, but to no avail. Then she remembered that Attorney Otis had a recent arm injury and she pushed against it. The respondent complained that she was hurting him, and she continued to push. Finally, the respondent said "This is wrong," and loosened his grip. She pushed him off and escaped.

Sara B. went to a friend's house where she spent the night. The next day, she returned home to find numerous messages on her answering machine from Attorney Otis apologizing to her. Shortly after she finished listening to the messages, she received another call from him. After Sara B. screamed at him and asked him if he realized what he had done, he replied that he knew he had "violated her," apologized, and said, "It won't happen again."

Sara B. felt she was unable to quit her job with Attorney Otis due to the threatened loss of her house, her financial situation, and because a final hearing on her divorce and child custody was scheduled for December 1989. She returned to work, and, although she was never physically assaulted again, the verbal harassment quickly resumed.

Throughout the time of her employment with the respondent, Sara B. was under stress and was in therapy for depression. In fact, she regularly left work with Attorney Otis' approval to attend her therapy appointments. On the Monday following the assault by Attorney Otis, she saw her psychotherapist, Sydna Julian, and described the assault of the previous Friday. Dr. Julian's notes of that session corroborated Sara B.'s testimony. Dr. Julian had also taken notes in previous sessions that reflected the ongoing sexual harassment as described by Sara B.

Shortly before the divorce and custody hearing, which had been postponed to May 1990, Sara B. obtained her therapist's notes in order to respond to a discovery request from her husband. For the first time, she learned that her therapist had taken notes regarding the sexual assault by Attorney Otis. Fearing this could harm her case, she secretly removed these notes. Before the hearing, her psychotherapist, who had learned what Sara B. had done, told her that because her husband had not been provided with a complete set of notes, he would not be able to testify on her behalf. He also advised her to meet with an independent attorney.

As a result of her meeting with a new attorney, she dismissed Attorney Otis and filed a motion to continue. The motion disclosed the sexual assault, and the superior court notified the committee of the

respondent's misconduct. On December 19, 1990, the committee filed its petition with the supreme court requesting the respondent's disbarment.

Following publicity concerning the committee's petition, five other former clients of the respondent, all female, came forward with stories of sexual harassment and inappropriate behavior by the respondent that tended to corroborate Sara B.'s allegations. All but one of the women were involved in divorce proceedings, and all were vulnerable. In each case, the respondent made sexually inappropriate remarks, and in all but one of the cases, the clients dismissed him as their counsel before obtaining the result for which he had been hired.

In his defense, the respondent offered medical evidence that, due to a prior head injury, he suffers from a sexual misconduct disorder "that causes him to have seizures which unpredictably change his character and [cause him to] lose complete control of his sexual conduct without being aware of what he is doing." According to Dr. Henry Astarjian, a neurologist, the respondent suffered from "partial complex seizures" that would affect his sexual conduct. According to the doctor, these seizures "force[d] him . . . to be engaged in an unsocial behavior. And that is out of his control. He can't control it even if he wanted to." Dr. Astarjian also testified that someone suffering from this condition may or may not remember the antisocial behavior.

The respondent subscribes to Dr. Astarjian's theory regarding the seizures. He neither denies nor admits that the harassment and assault occurred, but concedes that the incidents could have happened as described by the various witnesses. Even though several of his clients testified to being angry at him for his behavior and that he was surprised by their anger, he denies any memory of this.

Further, although the respondent denies all memory of the incidents testified to by his former clients, he admits that the conduct was "certainly inexcusable behavior for a professional. I recognize that, but I cannot say that it did happen. It's out of my ability to become aware of the incident as it was testified to here in this court. I can only say that it is inexcusable."

The committee's expert, Dr. Richard E. Nordgren, also testified that the respondent's head injury caused his conduct, but opined that the behavior was a conscious act and that the "episodes [were] not seizures or epilepsy." Because he did not view the episodes as seizures, Dr. Nordgren strongly disagreed with Dr. Astarjian's opinion that a change in the respondent's medication would so control his

behavior that he would not be a risk to repeat the same behavior in similar circumstances.

After reviewing all the evidence, the referee found that the respondent violated Rules 1.7(b), 1.8(b), and 8.4(a). The respondent, although admitting that he engaged in inappropriate conduct with certain clients, argues that the referee erred in finding clear and convincing evidence that he violated the Rules of Professional Conduct. Failing this argument, the respondent asserts that the sanction of disbarment is too severe, and that his actions only warrant a reasonable extension of the suspension that has been in effect since February 1991.

■ The first argument presented by the respondent is that there is no "linkage" between his actions and the handling of the clients' cases. According to the respondent, "it is difficult to perceive why [Sara B.'s] subjection to unwanted harassment by her employer . . . would prejudice her position in the divorce action." Thus, he concludes that the evidence of sexual misconduct does not support a conclusion that the Rules were violated. This argument is untenable.

Rule 1.7 provides, in pertinent part, that:

> "(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>     (1) the lawyer reasonably believes the representation will not be adversely affected; and
>      (2) the client consents after consultation and with knowledge of the consequences. . . ."

This rule only requires the *possibility* that the client's interests may be materially limited by the lawyer's interest.

The referee found that the respondent "admitted that pursuit of a sexual relationship with Ms. B. would have put her at risk of creating fault grounds against her in the contested divorce." Furthermore, in this context, "the respondent knew of the extreme importance to Ms. B. of finalizing her divorce as quickly as possible and admitted that the pursuit of a sexual relationship with Ms. B. ran the risk of delaying the divorce action by forcing her to obtain new counsel."

Furthermore, in this case the respondent's conduct went beyond the mere "possibility" of material limitation, in that it actually caused harm to Sara B.'s legal interests. As a direct result of the respondent's sexual assault, Sara B. was forced to delay her divorce hearing in order to obtain another attorney—a delay that may have contributed to her losing her home to foreclosure.

Although this rule provides an exception under certain conditions, neither condition has been met in this case. No lawyer could have reasonably concluded that the representation of Sara B. would not have been adversely affected. Furthermore, while this rule allows for a fully informed client to consent to the attorney's actions, the respondent does not dispute the referee's finding that he never advised Sara B. that sexual involvement with him created a potential conflict of interest and could harm her case.

Rule 1.8(b) states: "A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation and with knowledge of the consequences." In *Bourdon's Case*, 132 N.H. 365, 371, 565 A.2d 1052, 1056 (1989), we held that this rule would be violated if an attorney used information of a divorce client's vulnerability to pursue a sexual relationship with that client.

In this case, the referee found that "there is no question that Ms. B was highly vulnerable," that the respondent was aware of her vulnerability, and that "Attorney Otis sought to take advantage of Ms. B's emotional, financial and legal vulnerability by making repeated sexual advances toward her."

■■ In reviewing the referee's findings, "our only function is to determine whether a reasonable [person] could have reached the same decision as the [referee] on the basis of the evidence before him." *Bourdon's Case*, 132 N.H. at 370, 565 A.2d at 1055 (quotation omitted). The referee, who is in the best position to weigh the testimony of the witnesses, *Fitzpatrick's Case*, 132 N.H. 211, 215–16, 566 A.2d 157, 160 (1989), found the testimony of Sara B. to be compelling, and that of the respondent to be not credible. He also credited the expert testimony of Dr. Nordgren over that of Dr. Astarjian. As a result, the referee found, by clear and convincing evidence, that the respondent had engaged in professional misconduct when he sexually harassed and sexually assaulted Sara B. The record clearly supports that finding.

■ The respondent next contends that his inappropriate conduct should be mitigated because his actions flowed from an earlier head injury, and not from any "considered intention to take advantage of vulnerable persons." This argument is without merit. There was no dispute that the respondent knew right from wrong, and, as admitted by his own expert, if the respondent was aware of his misconduct, he was capable of taking preventive measures to ensure that either his behavior changed or that people were not harmed by it. The referee

found that "to some extent [the respondent] was in control of his actions and knew what was going on." Regardless of the respondent's ability to control his actions, he had an obligation to his clients to take whatever preventive measures were necessary to avoid causing harm.

We now turn to the question of the sanction to be imposed. The respondent argues that disbarment is too extreme given that his head injury caused his inappropriate behavior, and that counselling and a change in his medication have enabled him to control his behavior for the past six months. We disagree and conclude that the respondent's misconduct warrants disbarment.

> "The purpose of lawyer discipline is not to punish the attorney, but to maintain appropriate standards of professional conduct for the protection of the public and the maintenance of public confidence in the bar. By removing from the profession a person whose misconduct has proved him unfit to be entrusted with the duties and responsibilities belonging to the office of an attorney, the public and those charged with the administration of justice are protected."

*Bourdon's Case*, 132 N.H. at 375, 565 A.2d at 1058 (quotation omitted).

The egregiousness of the respondent's conduct and his failure to attempt to protect his clients from his misconduct lead us to conclude that the respondent is unfit to continue practicing law. Consequently, the respondent is hereby disbarred. Further, he is ordered to reimburse the committee for the costs of investigating and prosecuting this matter. SUP. CT. R. 37(16).

*So ordered.*

All concurred.