No. 79,816

In the Matter of JERRY L. BERG, *Respondent.*
(955 P.2d 1240)

Opinion filed March 6, 1998.

*Stanton A. Hazlett,* disciplinary administrator, argued the cause and was on the brief for petitioner.

*Jack Focht,* of Focht, Hughey, & Calvert, L.L.C., of Wichita, argued the cause and was on the brief for respondent, and *Jerry L. Berg,* respondent, argued the cause pro se.

*Per Curiam:* This is an original contested proceeding in discipline filed by the office of the Disciplinary Administrator against Jerry L. Berg of Wichita, Kansas, respondent, an attorney admitted to practice law in Kansas.

This matter was heard by a duly appointed panel of the Kansas Board for Discipline of Attorneys on June 23-26, 1997, which rendered a comprehensive and factually explicit 50-page report making specific findings of fact and conclusions of law. Due to the decision we reach, we will summarize the procedural matters, evidence presented, findings made, and conclusions reached in sufficient but not excruciating detail. We also utilize the reasoning of Supreme Court Rule 7.043 (1997 Kan. Ct. R. Annot. 47) and refer to complainants by their initials only.

Respondent was charged by the Disciplinary Administrator in six separate complaints. In two of the complaints, the panel found there was clear and convincing evidence to establish a violation of disciplinary rules in the event respondent had not been previously disciplined for this same conduct. However, because the panel was unable to determine the exact particulars of respondent's probation and prior discipline from the record it received, based on the doctrines of collateral estoppel and res judicata, the complaints referred to as the V.S. complaint and course of conduct complaint were dismissed.

The only significant finding from the two dismissed complaints pertains to respondent's prior discipline, which is set forth as follows:

"19. Respondent received prior discipline by the Kansas Disciplinary Administrator in the case of In the Matter of Jerry L. Berg, Respondent, Case Nos. B5143 and B5138 in June of 1994. In 1993, Respondent was found to have violated MRPC 8.4(d) and (g) arising out of two complaints filed by former female clients for sexual harassment. Respondent was placed on a one year probation conditioned upon his participation in group and individual counseling and quarterly reports to the Disciplinary Administrator's office. The probation was approved by a panel April 21, 1993. On May 3, 1994, the panel reconvened and recommended informal admonishment after being advised Respondent had complied with the conditions of his probation. Respondent was informally admonished on June 8, 1994."

The four complaints which resulted in findings of violations of the Model Rules of Professional Conduct (MRPC) are the K.L.C. complaint, the R.M. complaint, the A.C. complaint, and the intimidation of A.C. complaint.

The Disciplinary Administrator alleged that the acts of respondent violated MRPC 1.2 (1997 Kan. Ct. R. Annot. 273) (scope of representation), MRPC 1.3 (1997 Kan. Ct. R. Annot. 276) (diligence), MRPC 1.4 (1997 Kan. Ct. R. Annot. 282) (communication), MRPC 1.5 (1997 Kan. Ct. R. Annot. 289) (fees), MRPC 1.7 (1997 Kan. Ct. R. Annot. 297) (conflict of interest), MRPC 1.8(b) (1997 Kan. Ct. R. Annot. 301) (prohibited transactions), MRPC 2.1 (1997 Kan. Ct. R. Annot. 328) (advisor), MRPC 4.1 (1997 Kan. Ct. R. Annot. 348) (truthfulness in statements to others), MRPC 4.3 (1997 Kan. Ct. R. Annot. 350) (dealing with unrepresented person), MRPC 8.4(c), 8.4(d), and 8.4(g) (1997 Kan. Ct. R. Annot. 366) (misconduct), DR 1-102(A)(6), his oath of office, and such other disciplinary and professional conduct rules as the allegations gave notice of or which the evidence presented at the formal hearing proved.

At the commencement of the hearing, respondent objected to all allegations, facts, and issues contained in the present complaints which were known to the office of Disciplinary Administrator as of the earlier proceeding that occurred in April 1993. Respondent argued that discussion and consideration of these facts and issues were barred by the doctrines of collateral estoppel and res judicata. The panel overruled the objection and ruled the hearings would proceed on all of the allegations of the formal complaint.

The respondent then objected to allegations dealing with consensual sexual relations with persons not clients of the respondent and allegations of conduct with sexual connotations and suggestive comments to office staff, arguing those matters are not addressed by the MRPC and should not be a part of the present hearing. The respondent further argued that the formal complaint did not contain reasonable specificity to allow him to defend against allegations pertaining to sexual relations with persons not clients and conduct toward office staff. The respondent also objected generally on the basis of laches, claiming that some of the complaints were sufficiently dated such that they should not be heard. The respondent then renewed his motion to dismiss. The panel denied all of respondent's motions.

Respondent then challenged the makeup of the panel as having already determined the rules that would apply in the present matter. The chairman noted that the panel would unqualifiedly follow the rules and laws laid down by the Kansas Supreme Court and overruled respondent's challenge to the composition of the panel.

After hearing the witnesses called by the Disciplinary Administrator and the respondent and admitting exhibits introduced by both parties, the panel made specific findings in dismissing the two complaints referred to above and made specific findings resulting in findings of violations of the MRPC as to the following four complaints. The evidence relating to these complaints is summarized as follows:

### K.L.C.'s complaint

K.L.C. retained respondent in 1988 to represent her in a divorce. She had been married for 17 years, had two children, and had not completed her college degree. K.L.C. was suffering psychological and physical abuse from her husband and was suicidal.

K.L.C. informed respondent that her psychologist had referred her to him and described her husband's abusive behavior. K.L.C. was worried about losing custody of her children and did not have the ability to support them. Respondent asked many detailed questions about her sex life, including frequency, details, and satisfaction, and told her the information was needed to obtain grounds

for a divorce. Respondent also told K.L.C. that she would be divorced as soon as papers were filed, an impression she maintained until much later when she consulted with another attorney.

Following a court hearing on financial matters, respondent intervened on K.L.C.'s behalf when her husband verbally threatened her. Respondent stepped between the two and told the husband words to the effect that "to get to her you're going to have to go through me."

After this hearing, K.L.C. was emotionally and physically exhausted and believed respondent was going to protect her. Respondent suggested having lunch, where they drank alcoholic beverages. Respondent discussed his sexual relationships with his former and current wives. Respondent propositioned K.L.C., and the two had sex in a hotel across the street from respondent's office. Respondent admitted he solicited the sexual relationship and instituted the first physical contact with K.L.C.

During the pendency of the divorce proceedings, K.L.C. continued to be harassed by her husband, and respondent initiated three other encounters where sex occurred. Two were at his office, and one occurred when he went to her house on an afternoon while the children were at school. Feeling used and unhappy with the relationship and the progress of her divorce proceedings, K.L.C. ceased contact with respondent and employed attorney Don Lambdin to complete her divorce.

K.L.C. testified her relationship with respondent made her distrusting of people, especially attorneys. She had never been informed by respondent that their relationship could have an adverse effect on her divorce case.

K.L.C. did not willingly file an ethical complaint, but eventually spoke to an investigator who was looking into allegations against respondent. K.L.C. stated she had been trying to put everything behind her and had not wanted to make a statement or testify.

Lambdin testified K.L.C. was emotional and cried at his first meeting with her when she told him about her sexual encounters with respondent. Lambdin said K.L.C.'s husband was controlling and intimidating and K.L.C. was concerned about losing custody of her children and finances. Lambdin also told how respondent

had warned him that K.L.C. might come on to him, which he had told K.L.C. he knew was not true.

Respondent testified K.L.C. seemed competent and stable when he met her and she was not emotionally distraught. He remembered that she seemed more concerned about financial matters in her marriage than about emotional abuse. Respondent agreed that K.L.C. was frightened the day of the hearing, but he had not considered that she might be vulnerable.

## R.M.'s Complaint

R.M. first met respondent during her parents' divorce, when she was 14 or 15 years old, after he had been asked to help improve her conduct. R.M. and respondent discussed her involvement in a chemical dependency program as a result of alcoholism and drug addiction.

R.M. filed for a divorce in December 1992 when she was 18 years old and had a 1-year-old baby. When her first attorney made no progress with her case, R.M.'s mother referred her to respondent's firm in August 1993. At the first meeting, respondent made an inappropriate sexually explicit comment regarding R.M.'s boyfriend.

At the time she consulted respondent, R.M. was stressed, confused, suicidal, and seeing a counselor. R.M. was not worried about the custody of her child until DNA test results confirmed her husband's paternity. She then became concerned, fearing that her husband might try to take the child. R.M. was also troubled about ensuring that her husband continued to pay child support.

R.M.'s divorce was final on October 15, 1993. R.M. testified she went to respondent's office between 6 and 7 p.m. on October 14, 1993, to sign a property settlement agreement. Respondent then asked R.M. to have a drink with him. She agreed, although she was under the legal drinking age. Respondent ordered her an alcoholic drink called "Sex on the Beach" and two or more additional alcoholic drinks, and they discussed sexual matters and their sexual fantasies.

The two went back to respondent's office because he said there were more papers to sign, but once there, he grabbed R.M. and

started kissing her. R.M. eventually performed oral sex on respondent. R.M. testified she was scared and not prepared for that to happen, but she was worried respondent would not represent her in court the next day if she did not engage in sexual acts, which she admitted were not forced.

The next day, after the divorce was granted, R.M. testified that after she endorsed an income tax refund to respondent, she still owed $200, which he marked "paid in full." R.M. testified, "I felt like a whore because I felt like I had paid for my services the night before." R.M. did not receive any subsequent billings.

Respondent claimed he first had sex with R.M. on October 15, 1993, after her divorce was granted. Respondent presented evidence that he had met with other clients until 7 or 7:30 p.m. on October 14, 1993. He testified he believed she was no longer his client after her divorce was finalized and denied giving her any legal advice after the divorce. Respondent admitted he knew about R.M.'s sexual history because of the paternity issue in her case.

R.M. continued a sexual relationship with respondent. She testified she felt like she owed him and he was protecting her and would see that her support was paid.

Approximately a month after the divorce was granted, R.M. sought advice about visitation and was told to come to respondent's office, where they ended up having sex. R.M. said she continued to remain concerned about the payment of child support. She also asked respondent to draw up a will for her with provisions for the custody of her child. She believed respondent to be her attorney and testified he never, at any time prior to June 16, 1994, told her he was no longer representing her.

R.M. described in detail, which we need not memorialize in print, numerous sexual encounters with respondent. Many of these events had been described to respondent as her sexual fantasies and on one occasion, after respondent gave her alcoholic drinks, involved another female as a third partner. R.M. testified this woman gave her "crank" and then they all engaged in sexual acts.

On June 14, 1994, respondent called R.M. and asked to come to her apartment because he had just had a bad result in a big case. R.M. told him she had just had a miscarriage and did not want to

have sex. Respondent stated he just wanted to talk. He had been drinking when he arrived and pulled R.M. onto his lap. R.M. again told him she did not want to have sex. Respondent started kissing her, and though she told him "no," they had sex anyway. R.M. stated she did not resist because she had done so when she had been raped at 15 and had been beaten up, and if it was going to happen, she did not want to be beaten again.

After respondent left, R.M. cried until her sister and boyfriend arrived. They took her to a hospital, and hospital personnel informed the police. Although R.M. was interviewed by the police, respondent was never prosecuted.

Respondent admitted to having sex with R.M. on June 14, 1994, but testified it was consensual. Respondent said R.M. had wanted him to confront her boyfriend and stay with her, which was contrary to R.M.'s testimony.

On June 16, 1994, R.M. notified respondent in writing that his services as her attorney were terminated. She testified this was the first time she considered that respondent no longer represented her. R.M. filed a complaint with the Disciplinary Administrator's office the following day.

The third party in one of R.M.'s and respondent's sexual encounters testified she had received a phone call from R.M. on June 14, 1994, in which R.M. said she had just had great sex with respondent. This party could not recall if she had been using drugs at this time, admitted lying to the Disciplinary Administrator about having had sex with respondent, and stated that many years previously she had met respondent at a club where she was an exotic dancer. She admitted the two of them had developed a sexual relationship and subsequently respondent represented her in a couple of cases.

R.M.'s counselor testified about her 22 sessions with R.M. from August 1993 to April 1994. The counselor stated R.M. had been suicidal and very emotional and she had worked with R.M. to help her establish boundaries with respondent.

*A.C.'s complaint*

A.C. retained respondent in 1990 to help her regain custody of her two older children. A.C. was 22 years old, taking medication

for depression, and had a ninth-grade education. A.C. informed respondent she was on welfare and would do anything to get her children back. Respondent told her she would not have to pay at that time.

Respondent and A.C. went to Liberty, Missouri, to attend a court proceeding where A.C. was successful in regaining custody of the children. They stayed overnight at respondent's brother's home. Shortly after going to bed, respondent went to A.C.'s room and asked her to come to his room, where they had sex. A.C. testified she felt obligated to have sex with respondent, as she had not paid him any money at that point.

Respondent represented A.C. in two subsequent paternity actions involving her children. A.C. had frequent meetings with respondent and had sex with him at his office and in motel rooms. A.C.'s testimony concerning the time frame of the sexual relationship was confusing and stated it continued until "the end of '94, '95, somewhere around there," but on cross-examination she acknowledged it could have ended earlier.

Respondent purchased clothing and undergarments for A.C. and requested she model them for him to be sure they fit properly. A.C. also testified respondent provided her with money and helped her acquire an automobile.

A.C. had conversations about her bill with respondent, who told her he knew she would never be able to pay it all. As of August 31, 1992, A.C. was presented with a statement showing that she owed respondent $17,149.36. A.C. said she never told him she did not want to have sex with him any longer because she was afraid of losing her children.

A.C. moved to a different city sometime near the beginning of 1994. A.C. testified she had sex with respondent on at least one occasion after she moved away. A.C. stated she started refusing to meet respondent after hours because she knew it would lead to further sex, and she did not want to participate any more.

Respondent admitted to having had a sexual relationship with A.C. and estimated they had sex on five occasions, but claimed the last time was on December 28, 1992.

## Intimidation of A.C. complaint

In March 1996, A.C. lived in a mobile home. Respondent went to her home early in the morning on March 12, 1996. He went to A.C.'s former employer and inquired about where A.C. lived or worked. He later discovered A.C. lived in a mobile home. He could not find the home, so he went to the elementary school and asked for information about her children.

A teacher at the school testified that at 7:30 a.m., she saw a man she did not recognize in the building, whom she identified as respondent. Respondent told her he was looking for two students, which were two of A.C.'s children. The teacher did not recognize the names, so she went with respondent to inquire of another teacher. When asked to identify himself, respondent told her he was a caseworker or social worker for the court working on a custody case. Respondent obtained the names of the children's teachers.

The other teacher testified at the hearing that the first teacher introduced respondent as someone who worked for the SRS or was a caseworker and needed information on the two children. She stated that respondent did not identify himself as an attorney or correct the introduction.

Respondent left the school and went to a convenience store, where he obtained A.C.'s phone number. After respondent spoke to A.C., the city police chief arrived at the store.

The police chief testified that at 8 that morning he had received a call from A.C. stating that a suspicious vehicle had been parked in front of her residence and that the driver of the vehicle had called her from the convenience store. The chief went to the store, contacted respondent, and asked for identification. Respondent told the chief he was in town on a child custody case. The chief asked respondent why he had been at A.C.'s home, and respondent replied that he had been told by his lawyer to get a statement from A.C.

The chief asked respondent to follow him to A.C.'s home. Upon arrival, the chief went inside and spoke to A.C. and her boyfriend. The chief came out and told respondent that they did not want

him on the property and if he returned they would file a trespassing complaint.

Respondent testified A.C. had called on August 28, 1995, and told him she had been instructed by the Disciplinary Administrator's office not to talk to him. Respondent said he informed his attorney, who told him to get a statement from A.C. Respondent denied he was trying to intimidate A.C. and said he had identified himself at the school as an attorney working on a custody case.

*General factual findings made by the hearing panel*

During his conditional probation and after his informal admonition of June 8, 1994, respondent had sex with R.M. After his informal admonition, he also had sex with A.C.

Dr. Gary R. Hackney, a psychologist, testified respondent had been seeing him since March 11, 1993. Dr. Hackney described respondent as a sexual addict or a sexaholic. Dr. Hackney stated a sexaholic's behavior is uncontrollable; that a sexaholic needs specialized, ongoing care; and that sexaholics are never cured but may go into remission. Dr. Hackney said that the relapse rate for sexaholics is probably higher than for other addicts.

Dr. Hackney further indicated that it would be harder for a sexaholic to practice in the area of domestic relations representing females because there is a tremendous amount of emotion in this field. The male attorney becomes a powerful figure taking care of the woman, such that there is room for exploitation. Dr. Hackney explained that the "client is in a very weakened state, very vulnerable." Dr. Hackney testified that it would be important that a sexual addict not be involved in such situations and should not "toy with an addiction."

In mitigation, respondent presented a large volume of testimony regarding his reform. He testified that he attends weekly Bible study and accountability groups (Promise Keepers). He attends a Sexaholics Anonymous meeting at least once a week. He is planning on renewing his vows with his wife. Numerous attorneys have written letters indicating respondent is a very competent attorney, although most state that they have no information about the charges under investigation.

Respondent submitted a written offer of assistance from his counsel advising of the willingness to recruit a supervising attorney or attorneys or to personally supervise respondent's conduct under any terms and conditions to be set.

*The hearing panel's conclusions of law.*

The hearing panel's conclusions of law commented on respondent's arguments that he was the victim of changing societal norms, that the rules relating to sex between attorneys and clients are nebulous and undefined, that the panel should not judge respondent harshly because the MRPC does not specifically prohibit sex between attorneys and clients, and that a new rule should not be suddenly created and then used to subject respondent to discipline.

The panel opined it was not required to create any new rule or condemn all sex between attorneys and clients as a violation of the MRPC, quoted from formal opinion 92-364 of the Standing Committee on Ethics and Responsibility of the American Bar Association, and stated the emotionally distraught and financially dependent victims were manipulated and controlled by respondent for his sexual pleasures.

The panel further held it was not sex with the client per se that violates the MRPC, but the exploitation of the attorney-client relationship to the detriment of the client that does so. The panel cited *People v. Zeilinger*, 814 P.2d 808 (Colo. 1991); *In re Rinella*, 175 Ill. 2d 504, 677 N.E.2d 909 (1997); *Bourdon's Case*, 132 N.H. 365, 565 A.2d 1052 (1989); *Matter of Bowen*, 150 App. Div. 2d 905, 542 N.Y.S.2d 45 (1989); and *In re Di Pippo*, 678 A.2d 454 (R.I. 1996), as holding that attorney misconduct may exist despite not being specifically prohibited by a disciplinary rule when the fiduciary obligation between a client and her attorney is broken by sexual manipulation.

The panel found there is a significant danger in a divorce situation that the attorney may become a witness in the proceedings and also inflict great harm to the client when division of property or custody of children is contested. The panel noted that no reported decision approved of sex between an attorney and a client

and determined that multiple violations of the MRPC had occurred.

The panel found with the exception of the June 14, 1994, act with R.M., the evidence showed the sexual acts were consensual in that they were not openly resisted. However, the panel recognized that numerous cases hold that under facts similar to those here presented, no informed or meaningful consent could be given by a client. The panel then made the following specific findings, which we set forth in their entirety:

### "The KLC Complaint

"1. Respondent violated MRPC 1.7(b), relating to conflict of interest in representing a client when the representation was materially limited by the lawyer's own interest. Respondent used KLC's vulnerability and emotional distress to gain sexual favors.

"2. Respondent violated MRPC 1.8(b), relating to using information gained from the client to the disadvantage of the client. Respondent learned from KLC, as a part of the attorney-client relationship, that she was emotionally distraught, vulnerable, and in need of protection and counsel and used that knowledge to gain sexual favors.

"3. Respondent violated MRPC 2.1, relating to the exercise of independent professional judgment and rendering of candid advice. Respondent either knew or as a lawyer should have known that having sex with KLC during his representation of her could prejudice her legal rights.

"4. Respondent violated MRPC 3.7, relating to appearing in hearings or trials when he was likely to be called as a witness. Respondent knew that if his sexual acts with KLC were discovered he would be called as a witness in the child custody and support issues before the court.

"5. Respondent violated MRPC 8.4(d), relating to conduct that is prejudicial to the administration of justice, and rule 1.1, relating to competence. Any lawyer who practices in the field of domestic relations knows that having sex with a client during the pendency of a divorce action can cause irreparable injury to the client's case on the issues of child custody and child support as well as destroying any possibility of reconciliation.

"6. Respondent violated MRPC 8.4(g), relating to conduct that adversely reflects on the lawyer's fitness to practice law. Respondent asked KLC explicit questions about her sexual experiences and practices that went far beyond anything he needed to know to represent her in her divorce action.

### "The RM Complaint

"1. Respondent violated MRPC 1.7(b), relating to conflict of interest in representing a client when the representation was materially limited by the lawyer's

own interest. Respondent used RM's vulnerability and emotional distress to gain sexual favors.

"2. Respondent violated MRPC 1.8(b), relating to using information gained from the client to the disadvantage of the client.

"Respondent learned from RM, as a result of the attorney-client relationship, that she was emotionally distraught, vulnerable, and in need of protection and counsel and used that knowledge to gain sexual favors. Respondent learned of RM's past history of alcohol abuse and her intolerance for alcohol through the attorney-client relationship. He then used that information for his own benefit when he invited RM to go with him to a bar, purchased alcohol for her, and then talked about sexual matters, all of which led to the first oral sex episode in Respondent's office.

"3. Respondent violated MRPC 3.7, relating to appearing in hearings or trials when he was likely to be called as a witness. Respondent knew that if his sexual acts with RM were discovered he would be called as a witness in the child custody and support issues that were likely to be brought before the court.

"4. Respondent violated MRPC 8.4(g), relating to conduct that adversely reflects on the lawyer's fitness to practice law. Respondent asked RM explicit questions about her sexual experiences and practices that went far beyond anything he needed to know to represent her in her divorce action.

"5. Respondent further violated MRPC 8.4(d) and 8.4(g), relating to conduct that is prejudicial to the administration of justice and adversely reflects on the lawyer's fitness to practice law. Respondent paid for and served alcoholic beverages to a minor knowing that it was a violation of law and knowing that RM had previously been in treatment and hospitalized on at least one occasion for alcohol abuse.

"6. Respondent further violated MRPC 8.4(d), relating to conduct that is prejudicial to the administration of justice, as well as MRPC 8.4(g) relating to conduct that adversely reflects on the lawyer's fitness to practice law. Respondent committed a battery on the person of RM by engaging in a forced, unconsented sex act after having been told not to do so by RM.

### "The AC Complaint

"1. Respondent violated MRPC 1.7(b), relating to conflict of interest in representing a client when the representation was materially limited by the lawyer's own interest. Respondent used AC's vulnerability and emotional distress to gain sexual favors.

"2. Respondent violated MRPC 1.8(b), relating to using information gained from the client to the disadvantage of the client. Respondent learned from AC, as a part of the attorney-client relationship, that she was emotionally distraught, vulnerable, and in need of protection and counsel and used that knowledge to gain sexual favors.

"3. Respondent violated MRPC 2.1, relating to the exercise of independent professional judgment and rendering of candid advice. Respondent either knew

or as a lawyer should have known that having sex with [AC] during his representation of her could prejudice her legal rights.

"4. Respondent violated MRPC 3.7, relating to appearing in hearings or trials when he was likely to be called as a witness. Respondent knew that if his sexual acts with AC were discovered he would be called as a witness in the child custody and support issues before the court.

"5. Respondent violated MRPC 8.4(d), relating to conduct that is prejudicial to the administration of justice, and rule 1.1, relating to competence. Any lawyer who practices in the field of domestic relations knows that having sex with a third party during the pendency of a divorce action can cause irreparable injury to the client's case on the issues of child custody and child support as well as destroying any possibility of reconciliation.

### "The Intimidation of AC

"Respondent violated MRPC 4.1, relating to knowingly making a false statement of material fact to a third person. Respondent told two schoolteachers either that he was a social worker or that he was working on a child custody case; both of those statements were untrue at the time they were made.

"The hearing panel believes that the evidence established that Respondent's sole purpose behind his visit to [A.C.'s home] and the elementary school attended by AC's children was to intimidate AC and to frighten her into not talking to the investigating authorities from the Office of the Disciplinary Administrator. Respondent testified that his counsel told him on August 28, 1995, to obtain a statement from AC, and that the 'next opportunity' that he had to do so was March 12, 1996. Respondent's explanation is not credible, and we believe Respondent's action in going to [A.C.'s home] was an attempt to subvert the disciplinary process in violation of Supreme Court Rule 207. However, the hearing panel concludes that the evidence presented before the panel does not rise to the level of clear and convincing evidence. We therefore are unable to find a violation of Rule 207 by clear and convincing evidence although we nevertheless believe that such a violation occurred."

In mitigation, the panel found that respondent is a sex addict, constituting a personal or emotional problem or misfortune that contributed to the violation of the MRPC.

In aggravation, the panel found:

"(A) Prior disciplinary offense; Respondent was previously informally admonished for improper sexual behavior exhibited in earlier complaints; subsequent to receiving the informal admonishment Respondent engaged in two or more of the sexual acts which are the subject of this complaint.

"(B) Dishonest or selfish motives; Respondent's conduct was motivated solely by his selfish motives.

"(C) A pattern of misconduct; three of the complaints before this panel involve a substantially similar pattern of misconduct.

"(D) Multiple offenses; the panel has found multiple offenses under each complaint.

"(E) Vulnerability of victims; the panel cannot imagine more vulnerable victims.

"(I) Substantial experience in the practice of law; Respondent has been a lawyer for some 23 years and claims that 55 to 60% of his practice is devoted to the practice of domestic law; the panel finds that Respondent has had substantial experience in the practice of law.

"(K) Illegal conduct; Respondent procured and served alcohol to a minor on two occasions, knowing that the person was a minor and knowing that the minor had previously been hospitalized on one or more occasions for alcohol abuse. Impersonating a social worker may or may not constitute a crime."

The panel considered ABA Standards for Imposing Lawyer Sanctions 4.31 and 8.1 (1991 ed.), the great number of violations extending over a 7- or 8-year period, and the presence of numerous aggravating factors and recommended disbarment. The panel found respondent viewed his clients as prey to be manipulated and exploited for his apparently uncontrollable sexual cravings. The panel further specifically stated: "Many of Respondent's statements when he was a witness were self-serving and lacked credibility. Respondent's demeanor over the course of the four day hearing, both on and off the witness stand, cast further doubt on his credibility."

The panel was unanimous in its decision that respondent should not be allowed to continue to practice law.

A concurring opinion stated that more egregious acts had not been committed against clients in the author's 11-year Board experience. The complainants all feared losing custody of their children and were vulnerable. Furthermore, the author held respondent's acts are not typical of other lawyers, as he had suggested.

*Respondent's appeal*

Respondent's appeal contests the panel's ruling on his motions to dismiss and in limine. Regarding the panel's findings and conclusions, respondent specifically raises the following issues: (1) The state of the law relating to sexual relations between attorney and client, past, present, and future, is unclear and in a state of flux; (2) respondent has been denied due process and equal protection;

(3) material findings are not supported by clear and convincing evidence; (4) the panel's rulings were unsupportable as to logic, history, and authority; (5) R.M. was not a current client of respondent at the time they engaged in sexual activity; and (6) the recommended discipline is too harsh.

## Scope of Review

Supreme Court Rule 211(f) (1997 Kan. Ct. R. Annot. 224) provides in applicable part: "To warrant a finding of misconduct the charges must be established by clear and convincing evidence." Clear and convincing evidence is defined in *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 78, 596 P.2d 816 (1979), to mean "the witnesses to a fact must be found to be credible; the facts to which the witness testifies must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts in issue."

Our standard of review of disciplinary matters was recently set forth in *In re Carson*, 252 Kan. 399, 406, 845 P.2d 47 (1993), where we stated:

"In *State v. Klassen*, 207 Kan. 414, 415, 485 P.2d 1295 (1971), we explained that we have a 'duty in a disciplinary proceeding to examine the evidence and determine for ourselves the judgment to be entered.' In *State v. Zeigler*, 217 Kan. 748, 755, 538 P.2d 643 (1975), this court stated that, although the report of the disciplinary board 'is advisory only, it will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony.' See *In re Farmer*, 242 Kan. 296, 299, 747 P.2d 97 (1987)."

We apply the rules stated above in considering the evidence, the findings of the panel, and the arguments of the parties in making our determination of whether or not violations of the MRPC exist, and, if they do, deciding upon the appropriate discipline to be imposed. We have considered the issues raised by the respondent in the order set forth in his brief.

*The state of the law relating to sexual relations between attorney and client, past, present, and future, is not unclear and has not been in a state of flux.*

Respondent offers in justification for his actions the absence of specific rules relating to his stated conduct. Pointing to the lack of a bright-line rule and discussions here in Kansas and elsewhere of the desirability of establishing one, he asks us to excuse his actions because the danger posed to female clients was part of a changing scene. We are not impressed with respondent's argument any more than we are of his "no harm, no foul" contention, which asserts that because he was never called as a witness in a hearing involving a complainant and no client claimed to be injured as a result of respondent's representation, no violation of the MRPC occurred.

The Disciplinary Administrator takes the position that under the facts presented, the respondent's conduct with respect to sexual relationships with clients violates the MRPC.

Under the MRPC, there is no attempt to enumerate specific conduct of any particular kind or nature which violates our rules. Rather, respondent is charged with a course of conduct that resulted in the violation of numerous specific ethical rules prohibiting his behavior under these circumstances.

This is not the first time a case in this area has come before our court. A 1977 Kansas case involved the conduct of a district judge who had sexual relations with one female employee in his chambers, made sexual demands on another, terminated employees for refusing or refusing to continue a physical relationship, and made such activities a condition of continued employment. These practices were found to be violations of Canons 1, 2A, and 3B (4) of the Code of Judicial Conduct. See *In re Hammond*, 224 Kan. 745, 585 P.2d 1066 (1978). The ordered punishment appeared to have been tempered because the respondent had suffered extensive cardiovascular disease, become totally and permanently disabled, and retired, so suspension and removal from office was deemed unnecessary. However, the court did state:

"The infractions established are most flagrant; they were willful; and they reflect adversely upon the judiciary. Such conduct merits discipline no less substantial

than that recommended by the Commission [public censure and suspension without pay for a period of 6 months], and perhaps removal from office." 224 Kan. at 746.

These facts *are* distinguishable from our case, but they do point to a historical disfavor of sexual acts of a judge (still a lawyer) and an employee (rather than clients to whom a whole panorama of different obligations are owed).

While the record before us lacks preciseness as to the specific nature of the discipline imposed on respondent in 1993 and 1994, it is clear that an informal admonition took place on June 8, 1994, only 6 days before respondent's acts with R.M. on June 14, 1994. Additionally, respondent had been under the cloud of a 1-year probation subsequent to April 21, 1993. Any argument that respondent was somehow in a field of uncertainty rings hollow with this background.

Both parties quote from provisions in ABA Formal Opinion 92-364. Most significant to us are the conclusions, which read as follows:

"It is apparent that a sexual relationship during the course of representation can seriously harm the client's interests. Therefore, the Committee concludes that because of the danger of impairment to the lawyer's representation associated with a sexual relationship between lawyer and client, the lawyer would be well advised to refrain from such a relationship. *If such a sexual relationship occurs and the impairment is not avoided, the lawyer will have violated ethical obligations to the client.*

"The client's consent to sexual relations alone will rarely be sufficient to eliminate this danger. In many cases, the client's ability to give meaningful consent is vitiated by the lawyer's potential undue influence and/or the emotional vulnerability of the client. The lawyer may, therefore, be called upon in a disciplinary or other proceeding to show that the client consented, that the consent was freely given based on full and reasonable disclosure of the risks involved, and that any ensuing sexual relationship did not in any way disadvantage the client in the representation, that is, the attorney's judgment remained independent, the representation proceeded free of conflicts, the privilege was not compromised and the other ethical obligations to the client were fulfilled." (Emphasis added.)

The clients in the present situation never fully understood the complete legal significance of their acts. They were literally compelled to allow respondent's advances in the belief such was necessary to protect their representation.

Respondent's argument that it would be unfair to punish him because he was not on notice prior to 1994 that his behavior was potentially unethical is not persuasive. He cites no persuasive authority to substantiate a claim that it is not a violation of the MRPC to engage in a sexual relationship with a client because there is no clear rule prohibiting such conduct. The existing authority is to the contrary.

In *In re Rinella*, 175 Ill. 2d 504, 677 N.E.2d 909 (1997), the Supreme Court of Illinois rejected a similar argument and suspended Rinella from the practice of law for 3 years. The court stated:

> "[Rinella] contends that he cannot be sanctioned for engaging in sexual relations with his clients because no disciplinary rule specifically proscribes such conduct, and that imposing a sanction under these circumstances would violate due process because he did not have adequate notice that his conduct was prohibited. He also asserts that his conduct did not violate the specific rules cited by the Board and did not constitute overreaching.
>
> "Initially, we reject the respondent's contention that attorney misconduct is sanctionable only when it is specifically proscribed by the disciplinary rule. On the contrary, the standards of professional conduct enunciated by this court are not a manual designed to instruct attorneys what to do in every conceivable situation. . . .
>
> "[W]e do not believe that respondent, or any other member of the bar, could reasonably have considered the conduct involved here to be acceptable behavior under the rules governing the legal profession." 175 Ill. 2d at 514-15.

The court in *Matter of DiSandro*, 680 A.2d 73, 75 (R.I. 1996), noted there was no provision in the rules of professional conduct regarding sexual activity between attorneys and clients, but found respondent had violated ethical rules by engaging in a consensual sexual relationship with a client. In *Com. on Pro. Ethics & Conduct v. Hill*, 436 N.W.2d 57 (Iowa 1989), the Iowa Supreme Court ordered Hill's indefinite suspension for at least 3 months for having had sex with a divorce client, resulting in specific violations of disciplinary rules and ethical considerations. In *People v. Good*, 893 P.2d 101 (Colo. 1995), the court recognized that no rule explicitly prohibits a sexual relationship between attorney and client, but found Good had violated the state's ethical rules and suspended

him for 1 year. After quoting a portion of the ABA Formal Opinion discussed above, the *Good* court stated:

"Because the lawyer stands in a fiduciary relationship with the client, an unsolicited sexual advance by the lawyer debases the essence of the lawyer-client relationship. [Citation omitted.] Often the lawyer-client relationship is characterized by the dependence of the client on the lawyer's professional judgment, and a sexual relationship may well result from the lawyer's exploitation of the lawyer's dominant position." 893 P.2d at 103.

During the period respondent argues the rules have been changing, the cases have generally held a consensual sexual relationship between a lawyer and client violates the applicable ethical standards and subjects the attorney to discipline. See, *e.g., Disciplinary Counsel v. Paxton,* 66 Ohio St. 3d 163, 610 N.E.2d 979 (1993) (publicly reprimanding respondent who admitted to violating rule prohibiting the allowing of professional judgment to be affected by personal interests when he engaged in romantic relationship with divorce client); *In the Matter of James Woodrow Lewis,* 262 Ga. 37, 415 S.E.2d 173 (1992) (having sexual relationship while representing divorce client violated ethical rules and warranted 3-year suspension); *Otis' Case,* 135 N.H. 612, 609 A.2d 1199 (1992) (disbarring attorney for violating several ethical rules by pursuing sexual relationship with a client); *Drucker's Case,* 133 N.H. 326, 577 A.2d 1198 (1990) (suspending Drucker for 2 years for violating ethical rules by having sexual relationship with divorce client); *Matter of Discipline of Bergren,* 455 N.W.2d 856, 857 (S.D. 1990) (finding that having sexual relationships with clients violated specific disciplinary rules and suspending Bergren for 1 year due to sexual relationships with clients); *Disciplinary Proc. Against Ridgeway,* 158 Wisc. 2d 452, 462 N.W.2d 671 (1990) (suspending Ridgeway for 6 months for violating rules by having sexual contact with client); *Matter of Bowen,* 150 App. Div. 2d 905, 909, 542 N.Y.S.2d 45 (1989) (finding violations of disciplinary rules as a result of having sexual relationship with client and ordering 2-year suspension); *Kentucky Bar Ass'n v. Meredith,* 752 S.W.2d 786 (Ky. 1988)(finding violations of disciplinary rules by having sexual relationship with client).

There are a legion of cases in this area, and we have only cited a representative sampling. Respondent cited 207 cases in his brief, and we point the readers of this opinion to the following: Note, Regulation of Lawyer-Client Sex: Codifying the "Cold Shower" or a "Fatal Attraction" per se? 32 Washburn L.J. 379 (1993); Dubin, Sex and the Divorce Lawyer: Is the Client off Limits?, 1 Geo. J. Legal Ethics 585 (1988); and Annot., Sexual Misconduct as Ground for Disciplining Attorney or Judge, 43 A.L.R.4th 1062.

It is a lame excuse to ask not to be punished because one is the first attorney to be disciplined for the particular conduct involved in these complaints. It is even more lame considering the fact that respondent continued his conduct subsequent to being placed on probation and receiving an informal admonition. We reject such an argument and the entire premise upon which it is based.

*Respondent has not been denied due process and equal protection.*

Respondent essentially raises three arguments as to how he was denied his constitutional protections in this disciplinary proceeding.

He first argues it was improper to find he had violated MRPC 3.7 (1997 Kan. Ct. R. Annot. 345) (lawyer as witness) when he was not charged with violating that rule in the amended complaint. This, he claims, failed to provide him with sufficient notice of the charge against him and is prohibited by *State v. Caenen*, 235 Kan. 451, 681 P.2d 639 (1984).

Next, respondent asserts his defense was prejudiced by the failure to amend the complaint or send it back to a probable cause panel after discovering that R.M. did not claim all of her sexual encounters with respondent were forced.

Finally, respondent argues this proceeding violated his right to equal protection because he was charged with having had sex with someone other than his spouse, while others who engaged in the same behavior and were known to the Disciplinary Administrator's office were not.

The prayer of the amended formal complaint alleged respondent violated MRPC 1.2, 1.3, 1.4, 1.5, 1.7, 1.8(b), 2.1, 4.1, 4.3, 8.4(b),

8.4(c), 8.4(d), and 8.4(g), Supreme Court Rule 207 (1997 Kan. Ct. R. Annot. 213), and DR 1-102(A)(6).

Respondent relies on portions of *Caenen*, which does contain a statement that if violation of specific rules are charged, the State is thereafter limited to such specific offenses, citing *Attorney Griev. Comm'n v. McBurney*, 282 Md. 116, 123-24, 383 A.2d 58 (1978). A complete reading of *Caenen* does not indicate our intent to embrace such a specific rule, as reflected in a further statement of the opinion:

"Subsequent to the *Ruffalo* decision, the due process requirements in lawyer disciplinary proceedings have been given exhaustive treatment by this court. In *State v. Turner*, 217 Kan. 574, 538 P.2d 966 (1975), 87 A.L.R.3d 337, the court summarized prior Kansas and federal precedent on the question, including *Ruffalo*, and held in accordance with established precedent that the State need not set forth in its complaint the specific disciplinary rules allegedly violated (*State v. Nelson*, 206 Kan. 154, 476 P.2d 240 [1970]), nor is it required to plead specific allegations of misconduct (*State v. Alvey*, 215 Kan. 460, 524 P.2d 747 [1974]). What is required was simply stated therein:
' "We must conclude that where the facts in connection with the charge are clearly set out in the complaint a respondent is put on notice as to what ethical violations may arise therefrom. . . .
. . . .
' "It is not incumbent on the board to notify the respondent of charges of specific acts of misconduct as long as proper notice is given of the basic factual situation out of which the charges might result." ' *State v. Turner*, 217 Kan. at 579-80." 235 Kan. at 459.

The amended formal complaint alleged the violations in graphic detail. Respondent cites no Kansas case where a violation has been stricken because it was not numbered along with others. The panel concluded MRPC 3.7 was violated in connection with the K.L.C., R.M., and A.C. complaints because the respondent knew or should have known if his sexual relationship was discovered he could be called as a witness in the child custody and support issues that were then or could subsequently be brought before the court.

This issue arose during the hearing and out of the facts alleged in the complaint to which respondent was well informed he would be required to defend. While the better procedure might have been to ask to amend the allegations to conform to the evidence presented, we are not prepared to find reversible error here. The

prayer of the amended complaint did allege the violation of "such other disciplinary and professional conduct rules as the allegations give notice of or which the evidence presented at the Formal Hearing may prove." This is sufficient notice.

Respondent claims the failure to amend the complaint to reflect that he did not force R.M. to participate in most of the sexual acts deprives him of due process. The complaint does not allege all the encounters were forced, which is an admission that most were consensual. However, R.M. never retreated from her statements and testimony that the June 14, 1994, incident involved forced intercourse. There appear to be differing interpretations between the parties as to their definition of force, which we need not resolve as it does not invalidate or require a dismissal of the complaint. The panel heard the evidence of both of the parties to the relationship and clearly found the occurrence of a circumstance in which force existed. Such is sufficient to satisfy due process and equal protection requirements.

Finally, the request for dismissal because no other attorneys have been disciplined for having extramarital affairs is totally without merit. All of the allegations arise out of the existence of an attorney-client relationship, and it is never a defense to any ethical complaint that the conduct of others may go unknown or unprosecuted.

The due process and equal protection contentions form no basis to grant relief to the respondent.

*Material findings are supported by clear and convincing evidence.*

Respondent challenges many of the panel's findings and the conclusions which follow. In evaluating these contentions, we remember our admonition from *In re Farmer*, 242 Kan. 296, 299, 747 P.2d 97 (1987), that "respondent's denial of the factual allegations against him does not compel the finding that there is no clear and convincing evidence of misconduct on his part."

In many instances, respondent's arguments merely point out where his testimony was not consistent with that of K.L.C., R.M., or A.C., and he contends that because of this, the panel's findings were not based on clear and convincing evidence. In considering

this argument, we look to our statement in *In re Harris*, 261 Kan. 1063, 1066, 934 P.2d 965 (1997) (quoting *Ortega v. IBP, Inc.*, 255 Kan. 513, Syl. ¶ 2, 874 P.2d 1188 [1994]), that evidence is convincing " 'if it is reasonable and persuasive enough to cause the trier of facts to believe it.' "

Most of respondent's arguments ask us to adopt his interpretation of the testimony when the witnesses were heard by the panel, which can better judge their credibility. The final hearing report states: "Many of Respondent's statements when he was a witness were self-serving and lacked credibility. Respondent's demeanor over the course of the four day hearing, both on and off the witness stand, cast further doubt on his credibility."

Although respondent claims custody was not an issue in the divorce cases, the testimony of all of the female clients clearly shows they were concerned about retaining custody of their children. The fact custody was not a tried issue in a contested case does not discredit the panel's findings.

The nature and extent of the sexual contacts with K.L.C. was testified to differently by the respondent and K.L.C. The panel heard her testimony, judged her demeanor and that of respondent, and believed her testimony, as it had every right to do.

The discrepancy as to whether the first encounter with R.M. occurred the night before or the night of her divorce was resolved in favor of R.M.'s testimony. However, it is no more persuasive to attempt to justify one's conduct by arguing a scenario of scarcely letting the ink on the divorce decree become dry, extracting all available funds from the client (an income tax refund), and then writing off the balance of the bill with the stroke of a pen and immediately beginning to seduce with alcoholic drinks an under the drinking age and vulnerable client. This conduct would have been a violation of ethical rules even if the panel had believed respondent's testimony, which it obviously did not. Furthermore, it is clear that R.M. had concerns about child support and considered that respondent still represented her in the post-divorce period up until June 16, 1994.

The differences in the testimony about respondent's encounter with R.M. on June 14, 1994, are not material to our ultimate con-

clusion. The panel obviously believed R.M.'s version, but respondent was never charged with any criminal conduct, lessening the significance of the issue involving the nature and extent of R.M.'s consent. That this event occurred 6 days after respondent's informal admonition on June 8, 1994, however, shows respondent had no intention of limiting his sexual activities.

The time of the ending of the sexual relationship with A.C. was disputed, but the testimony of A.C. that it continued until "the end of '94, '95, somewhere around there" gave a sufficient basis for the panel's findings. The record shows respondent's representation of A.C. lasted until September 1996.

We will not nit-pick isolated parts of 4 days of testimony. We have examined the entire record and hold there was clear and convincing evidence to support the findings made by the panel which are material to the discussion regarding respondent's violations of the MRPC.

*The panel's rulings are legally supportable.*

Respondent complains that the panel's statement that the clients did not give meaningful consent means a divorce lawyer who has a sexual relationship with a client is guilty of rape. We do not take the panel's findings to compel such a conclusion.

What the panel did conclude was that "[m]ore vulnerable and emotionally distraught clients are difficult for this panel to imagine." The panel further found K.L.C., R.M., and A.C. were "vulnerable and in desperate need of advice, counsel and support that could have been provided by a good lawyer. Instead they found a sex addict who manipulated and controlled them."

It is not really significant to resolve this issue one way or the other, for no criminal charges were ever filed and "consent" was only at issue as to the June 14, 1994, encounter with R.M. On a purely legal basis it appears that consent was given in all other cases, but it was the circumstances under which the consent was extracted that are material to this proceeding and which support the ultimate conclusions of multiple violations of the MRPC reached by the panel and this court.

*The panel correctly concluded R.M. was a client of respondent at the time they engaged in sexual activity.*

Respondent argues the panel ducked the question of whether R.M. was a current client at the time of all of the sexual activity. He claims this is an important issue and if the attorney-client relationship did not exist, the basis for his claimed violations is extinguished.

We have previously discussed the October 14 and 15 issue and need not restate those conflicts except to say there was sufficient evidence to substantiate the panel's findings.

At all times subsequent to the granting of the divorce, R.M. testified she considered respondent to be her attorney. She relied on him as to matters of child support, consulted him about visitation involving her ex-husband's girlfriend, and asked about a will which he apparently never drew. In her mind, at least, the attorney-client relationship continued. Further, the court file of R.M.'s divorce shows respondent filed a notice of R.M.'s completion of her children of divorce workshop. Respondent filed this document on December 13, 1993, and it is noted on the document that he was the attorney for the petitioner, R.M.

We do not intend to hand down any hard and fast rule regarding when an attorney-client relationship exists, as every situation would be different and require a different answer. However, under the facts and circumstances and giving R.M.'s testimony the consideration to which it is entitled, we accept the panel's conclusion that R.M. continued to be a client subsequent to her divorce and up through June 16, 1994. This conclusion makes respondent's actions on June 14, 1994, even more egregious as it followed a year on probation and an express admonishment 6 days earlier.

We have considered all of the arguments raised by the respondent either before the hearing panel or by his brief, and this court unanimously concludes and rules that clear and convincing evidence was adduced to prove respondent violated all of the MRPC provisions as found by the hearing panel.

*Disbarment is the appropriate sanction.*

Both parties agree there is no Kansas precedent upon which to base an appropriate sanction in this case.

Respondent argues strenuously that the discipline of disbarment recommended by the panel is too harsh and does not compare to equivalent violations in other states. Respondent cites a string of cases, largely without factual analysis, to contend the discipline in the majority of the cases has been something less than disbarment.

The Disciplinary Administrator urges us to consider our statement in *In re Jones,* 252 Kan. 236, 239, 843 P.2d 709 (1992), where we said:

"Comparison of past sanctions imposed in disciplinary cases is of little guidance. Each case is evaluated individually in light of its particular facts and circumstances and in light of protecting the public. The public is protected if attorneys furnish adequate legal services with integrity and honesty.

"Furthermore, this court is not bound by the recommendation of a hearing panel. Disbarment is an appropriate sanction in cases involving a serious breach of the disciplinary rules."

In considering an appropriate sanction, we consider the facts surrounding the violation of the ethical rules, as well as aggravating and mitigating circumstances. 252 Kan. at 239.

Respondent complains his evidence in mitigation was disregarded, but fails to point to the enumerated ABA factors it supported. The panel was obviously dissatisfied with respondent's expressions of remorse and believed his current actions were nothing more than self-serving attempts to avoid punishment for flagrant violations of his fiduciary duty to women who placed their rights and trust in his hands.

The panel permissibly rejected letters from attorneys commenting on respondent's ability and character, as none related to the specific violations in the proceeding. The fact that the clients' legal rights were not prejudiced is a factor, but it is considerably more significant that there was a potential for legal harm and that emotional pain and injury were inflicted on K.L.C., R.M., and A.C.

It is not helpful to try to categorize the large number of cases in this area, for one may be found to support practically any point one wishes to emphasize. Although factually different, one case cited by both parties (and distinguished by respondent), *Otis' Case,* 135 N.H. 612, 609 A.2d 1199 (1992), pointed to one of the responsibilities shared by this court in a discipline case when it stated:

" 'The purpose of lawyer discipline is not to punish the attorney, but to maintain appropriate standards of professional conduct for the protection of the public and the maintenance of public confidence in the bar. By removing from the profession a person whose misconduct has proved him unfit to be entrusted with the duties and responsibilities belonging to the office of an attorney, the public and those charged with the administration of justice are protected.'
*Bourdon's Case,* 132 N.H. at 375, 565 A.2d at 1058 (quotation omitted).
"The egregiousness of the respondent's conduct and his failure to attempt to protect his clients from his misconduct lead us to conclude that the respondent is unfit to continue practicing law. Consequently, the respondent is hereby disbarred." 135 N.H. at 619.

We view our obligation similarly. Respondent engaged in inappropriate sexual behavior with numerous clients who were very vulnerable. He used his license to practice law to the disadvantage of his clients. The panel found by clear and convincing evidence that respondent committed a battery on R.M. by "engaging in a forced, unconsented sex act after having been told not to do so by R.M." Respondent's conduct is clearly egregious, regardless of whether it was caused by a sexual addiction. Furthermore, despite respondent's stated efforts to stop representing women in divorce cases, respondent maintains a domestic relations practice, and his own expert testified that such a situation could be very dangerous for a sexual addict. Even if supervised, respondent remains a danger to female clients.

While much of the conduct complained of existed prior to the 1993 finding that respondent violated MRPC 8.4(d) and (g), arising out of two complaints filed by former female clients for sexual harassment, respondent's conduct continued unabated during the probationary period of April 21, 1993, to May 3, 1994, which resulted in the informal admonishment of June 8, 1994, previously referred to herein. The June 14, 1994, episode with R.M. occurred 6 days after the respondent had been informally admonished by the Disciplinary Administrator.

It is the decision of a majority of this court that respondent should be disbarred.

IT IS THEREFORE ORDERED that based on clear and convincing evidence, Jerry L. Berg be and is hereby disciplined for violations of MRPC 1.7(b), 1.8(b), 2.1, 3.7, 4.1, 8.4(d), and 8.4(g).

It Is FURTHER ORDERED that Jerry L. Berg be disbarred.

It Is FURTHER ORDERED that Jerry L. Berg shall forthwith comply with Supreme Court Rule 218 (1997 Kan. Ct. R. Annot. 235) and pay the costs of this action.

It Is FURTHER ORDERED that this order be published in the official Kansas Reports.

ABBOTT, J., not participating.

DAVID S. KNUDSON, Judge, assigned.