No. 83,263

In the Matter of STEVEN A. KRAUSHAAR, *Respondent.*

(997 P.2d 81)

Opinion filed January, 28, 2000.

*Edwin A. Van Petten,* deputy disciplinary administrator, argued the cause and was on the brief for petitioner.

*John J. Ambrosio,* of John J. Ambrosio, Chartered, argued the cause, and *Kathleen A. Downey,* of the same firm, was with him on the brief for respondent. *Steven A. Kraushaar,* respondent, appeared pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the Office of the Disciplinary Administrator against the respondent, Steven A. Kraushaar, alleging violations of Kansas Rules of Professional Conduct (KRPC) 8.4 (1999 Kan. Ct. R. Annot. 399). The panel recommends a 2-year suspension from the practice of law. We impose a 1-year suspension from the practice of law.

Kraushaar, an attorney admitted to the practice of law in Kansas in 1985, has been before us on two earlier occasions. See *State v. Kraushaar,* 264 Kan. 667, 957 P.2d 1106 (1998); *In re Kraushaar,* 258 Kan. 772, 907 P.2d 836 (1995).

The office of the Disciplinary Administrator filed the formal complaint in this case following a series of three incidents. The first involved Kraushaar notarizing a signature on a quitclaim deed. The other two incidents involve reimbursement requests for allegedly personal travel expenditures. The facts of each incident are set out in our discussion.

Kraushaar filed exceptions to the hearing panel's report. He takes issue with many of the panel's findings of fact and factors in aggravation and mitigation of punishment. He contends the appropriate punishment is an informal admonition or published censure.

## DISCUSSION

A finding of attorney misconduct requires proof "by clear and convincing evidence." Supreme Court Rule 211(f) (1999 Kan. Ct.

R. Annot. 235.) In disciplinary matters, we have a duty to examine the evidence and decide for ourselves the judgment to be entered. The report of the disciplinary board is advisory only. However, we give it the same dignity as a special verdict by a jury, or the findings of a trial court. The report will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony. See *In re Carson*, 252 Kan. 399, 406, 845 P. 2d 47 (1993); *In re Farmer*, 242 Kan. 296, 299, 747 P. 2d 97 (1987); *State v. Zeigler*, 217 Kan. 748, 755, 538 P. 2d 643 (1975). We apply these rules in considering the evidence, the findings of the panel, and the arguments of the parties. If we find violations of the KRPC exist we decide upon the appropriate discipline. *In re Berg*, 264 Kan. 254, 269, 955 P. 2d 1240 (1998).

The panel made the following findings of fact:

### "THE DEED INCIDENT

"2. On April 30, 1994, Respondent was contacted by Yvonne Dunnigan to pre-pare and notarize a quitclaim deed for the transfer of property which she owned with her husband. Respondent had never represented Ms. Dunnigan as a client, but knew who she was.

"3. Respondent testified that he told Ms. Dunnigan to take the deed home to have her husband review the document. The following morning Ms. Dunnigan presented the deed to Respondent. The deed had already been signed by one purporting to be Ms. Dunnigan's husband.

Respondent testified that he was under the impression that K.S.A. 58-503 or 58-508 of the Kansas statutes permitted the signature of an absent spouse to be notarized if the other spouse swore under the oath that the signature on the deed was that of the absent spouse.

"4. K.S.A. 58-503 deals with an amplification of the rule in Shelley's case and estates tail.

"5. There is no statute numbered 58-508.

"6. Respondent was aware that both husband and wife had to sign before him and in his presence. 'And I told her that both of them had to sign the deed in my presence.' 'And she said he had signed the deed the night before and I informed her, "Well, he needs to sign the deed in front of me."'

"7. Respondent also testified,

'. . . When I notarized the deed, I thought there was a statute that provided that if a person had signed a document not in the presence of the notary, that if you had someone who could—had substantial or sufficient evidence to state under oath regarding the material facts of the situation on—and that that person was

the person who signed the document, that that was a proper way to notarize it. And I think that's K.S.A. 58 dash—. I thought—it appears I was in error on that. I have to admit that I thought it could be done that way when you have a wife and she would state to me under oath that her husband had signed it the night before and that he was, in fact, a husband. I thought that was the proper way, but I—.'

"8.    Respondent notarized the signatures of Ms. Dunnigan and the signature of one purporting to be her husband.

"9.    Respondent was subsequently notified that the Dunnigans were going through a divorce and that the signature purporting to be that of Mr. Dunnigan was in fact a forgery.

"10.    Respondent testified that he received a telephone call from either Mr. Dunnigan or his attorney, and Respondent testified as follows,

'As soon as I got off the phone with Mr. Dunnigan, I called the sheriff's office to report the matter to the sheriff. He wasn't at the sheriff's office, but the dispatcher informed me he was at the courthouse. So I walked over to the courthouse and found the sheriff in the hallway and told him what had happened and that I believed that it was a forgery on the deed.'

"11.    A criminal complaint was filed in this matter in the District Court of Marshall County, Kansas, Case No. 96-CR-67, entitled State of Kansas vs. Steven A. Kraushaar.

"12.    Disciplinary Administrator's Exhibit 'B' consists of the transcript of the preliminary hearing in the criminal complaint, and the Marshall County sheriff testified that he had a conversation with Mr. Kraushaar, but under somewhat difference circumstances than those to which Mr. Kraushaar testified, as follows:

'Q.    [By Defense Counsel Opat]
        Did you have a conversation with Mr. Kraushaar?
'A.    [By Sheriff Coggins]
        Yes, I did.
'Q.    Who initiated that?
'A.    I did.
'Q.    Where did the conversation take place?
'A.    In Mr. Kraushaar's office.
'Q.    What was the nature of the conversation?
'A.    May I read from my report?
'Q.    If you need to refresh your recollection.
'A.    It was on 6-14-94, which was on a Tuesday, and I visited with Mr. Kraushaar, and I went in to tell him what had been going on with Mr. Dunnigan, that we received a call and—for the forgery, and about the quitclaim deed. And Mr. Kraushaar at that time was telling me that Mrs. Dunnigan had come into his office wanting a quitclaim deed. Mr. Kraushaar said it had to be signed by her husband.'

"13.    The felony charges against Mr. Kraushaar were subsequently dismissed, and the Kansas Supreme Court affirmed that dismissal, stating that a more specific statute governed the crime. No charges were refiled.

## "THE PHILADELPHIA SEMINAR INCIDENT

"14. In October, 1994, Respondent attended a seminar in Philadelphia, Pennsylvania, in his capacity as Marshall County attorney. The seminar concluded on Wednesday, November 2, 1994 at approximately 12:00 noon. The Respondent remained in Philadelphia until November 4, 1994, with his girlfriend, charging the extra two nights on personal VISA credit card account and later submitting the total bill, including the extra days, to Marshall County, Kansas, for reimbursement through the Prosecuting Attorneys Training Fund (PATF).

"15. The PATF expense report was subsequently prepared by Respondent's secretary and did not list the extra days as personal expense but included them as reimbursable expenditures in the report.

"16. Respondent testified that he spent the additional time following the formal conclusion of the seminar so that he could attend informal discussion groups with other prosecutors. Respondent testified that on the afternoon of the day that the formal seminar concluded and then all of the next day he informally met and talked with other prosecutors about common problems.

"17. Respondent testified that he had attended other seminars sponsored by the same organization and that it was a common practice following the conclusion of the formal portion of the seminar for prosecutors who attended the seminar informally to talk about common problems.

"18. Respondent also testified as follows:

'Q. [Mr. Van Petten]
You made your reservations before you went to Philadelphia, correct?

'A. [Respondent]
Yes.

'Q. Both airline and motel accommodations?

'A. Yes.

'Q. So you had intended to stay the extra days prior to even going to Philadelphia?

'A. Yes. And if they did not have these meetings, I would have come home earlier. The reason I spent Thursday night is because it went into late afternoon and I could have got on a plane and left Philadelphia.'

"19. The Respondent also testified:

'Q. [Mr. Van Petten]
And at least, according to their report, you stated simply that you stayed the extra day because you wanted to and you hadn't had a vacation in several years?

'A. [Respondent]
Yes. What I was talking about is whenever I was out of the office, to me it was a vacation. I never took any regular vacations and any time I was at these seminars, to me it was like a vacation.'

"20. Agent John Kite of the Kansas Bureau of Investigation interviewed Respondent in February of 1996 regarding the Philadelphia seminar incident. Agent Kite testified as follows:

'Q.   [Mr. Van Petten].·

And did he, in fact, inform you that he was attending these informal dis-
cussion groups sessions on November 3rd and 4th, 1994?

'A.   [Kite]

. I don't remember anything about informal discussion groups.

'Q.   Did he, in fact, tell you simply that he stayed the extra time because he
wanted to and he hadn't had a vacation for several years?

'A.   That's correct.'

"21.   This is consistent with Mr. Kite's earlier testimony at the preliminary hear-
ing reflected in Exhibit 'B':

'Q.   [By Prosecutor]

Did you ask him why they stayed from 11:30 Wednesday until approxi-
mately 6:00 p.m on Friday? Why did they stay the extra two days?

'A.   [Kite]

He said he hadn't had a vacation for a long time and he wanted to stay
because he wanted to.'

"22.   The seminar concluded at approximately 12:00 noon, but because of the
difficulty of making plane connections, the Disciplinary Administrator does not
contend that there was anything improper with Respondent's staying the evening
of the day on which the formal seminar concluded.

"23.   Although Respondent's girlfriend stayed with him in the same hotel room,
the Respondent was not charged and did not pay for the additional $10.00 per
night double occupancy rate.

"24.   Respondent explained the failure of the hotel to charge for two people by
stating, 'And they did not bill for two people. She was standing right beside me
when I checked in the hotel. I told them she would be there with me.'

## "THE TOPEKA INCIDENT

"25.   On July 9, 1994, Respondent traveled to Topeka, Kansas, to stay at the
Clubhouse Inn. He stayed Saturday evening and Sunday evening, July 9 and 10,
and attended a seminar in Lawrence on July 11.

"26.   Respondent was handling a case involving residential burglaries and went
to Onaga, Kansas, to visit the mother of one of the suspects.

"27.   After talking with the mother, Respondent testified that he wanted to check
out the mother's story, so he decided to return to Marysville, to pick up the case
files, and go to Topeka, where the suspect's mother claimed the suspect had lived.

"28.   Respondent testified that approximately noon to 1:00 on Saturday that he
decided to go to Topeka, and stated, 'And I wanted to get back here [Topeka]
because I wanted to check some of these pawn shops here in town. And I figured
they probably close about 5:00 and I need to get back here before 5:00, which is
what I did. . . . [W]hen I got to town, I called my fiancee and asked her some
general directions on how to find some of these addresses.'

"29.   Respondent testified that he drove to the house at the address where the
suspect's mother had given him where her son had lived, and then he walked

around some of the houses to see 'if they knew these guys or anything and none of them knew them. They didn't know anything.'

"30. Respondent then testified that by that time it was 6:00 or 7:00 p.m., and he then went to dinner with his fiancee. He then said that he knew he was going to return to Topeka on Sunday so that he could attend the seminar in Lawrence on Monday, 'so what I did was I checked in to the Clubhouse Inn by myself after I ate, you know, dinner, and worked on these three cases. She went home. She lives with her mother. She went home and stayed with her mother and I worked on the case Saturday night, these three cases. It was, you know, not exciting. And the reason I had stayed there is because they have a breakfast in the morning. It's a free breakfast. . . . And I got up Sunday morning, ate the breakfast that went along with the hotel rate. . . . I stayed there Sunday night by myself. She stayed with her mother here in Topeka and I got up early Monday morning, ate breakfast free and went to the seminar in Lawrence . . . it was no meal expense on this weekend because I could eat enough in the breakfast to hold me over for breakfast and lunch.'

"31. Instead of submitting the detailed motel receipt that would have shown Respondent spent two nights, Respondent presented only a receipt that showed 'hotel $68.76,' and his VISA card charge showing $68.76. The receipt submitted did not show that Respondent spent two nights at the Clubhouse Inn.

"32. KBI Agent Kite testified that when he interviewed Respondent that Respondent said that he did not exactly remember what he had been doing in Topeka. Agent Kite testified that Respondent said that he was 'probably at the Washburn Law Library doing some kind of research.' Agent Kite also testified that Respondent did not relate a particular matter that he would have been or could have been researching at Washburn. Respondent had not copied any cases and had not made any notes in his case files. Respondent told Agent Kite that he did not have any independent recall of what he had been doing, but that he had gone to Topeka to check out an alibi defense. Respondent told Agent Kite that he was doing a lot of research but did not remember what it was about.

"33. Respondent also testified,

'[T]his was a big case; This was the most significant burglary case in Marshall County in my tenure, eight year tenure in thousands of cases I prosecuted. It is rare to have people get out of prison, go to Marshall County five miles from that county commissioner's residence, break in the house, break in the doors, steal all their stereo equipment, all their TV's, all their guns, thousands of rounds of ammunition in order to buy drugs. That's a big case up there.'

"34. Respondent additionally testified:

'Q. [Mr. Van Petten]
    Just with regards to the Saturday, July 9, 1994, when you traveled to Topeka, did you contact any law enforcement agencies regarding the trip to Topeka?
'A. [Respondent]
    No.

'Q. Did you inform the local law enforcement in Marshall County of the additional information you had received and that you were proceeding to Topeka?

'A. No.

'Q. Did you consider the fact that if, in fact, your investigation would have been fruitful, you would have become a witness in the case and unable to continue the prosecution?

'A. No, I don't—I was trying to locate the alibi witnesses and some of the property and, no.' "

With one exception, the panel's findings are supported by clear and convincing evidence. The exception deals with Kraushaar's claim that he thought there was a statute permitting him to notarize the deed in the manner that he did. The panel did not find the statute referred to by Kraushaar because he incorrectly stated it was K.S.A. 58-503 or K.S.A. 58-508. As the panel observed, there is no statute numbered 58-508, and 58-503 does not deal with notarizing documents. Kraushaar explains in his brief that he intended to direct the panel's attention to K.S.A. 53-503(f) which says:

"A notarial officer has satisfactory evidence that person is the person whose true signature is on a document if that person is (1) personally known to the notarial officer, (2) identified upon the oath or affirmation of a credible witness personally known to the notarial officer or (3) identified on the basis of identification documents."

While we are not here to construe K.S.A. 53-503(f), suffice it to say that 53-503(f) does not even arguably permit what Kraushaar purported to the panel. Moreover, the panel found the deed incident less serious than the two remaining incidents because, according to the panel: "[I]t is a common but improper practice among many notaries, including members of the bar who are notaries, to notarize the signatures of people who do not physically and actually sign before the notary." Thus, the panel considered what Kraushaar urged; that he may have only been negligent in notarizing the deed because of a mistaken belief about the rules of notarizing.

Kraushaar takes issue with many other panel findings of fact. However, with the exception already noted, this is nothing more than an argument that the panel should have believed his testi-

mony. Kraushaar argues that his testimony was accurate, but that of other witnesses was not. The panel did not find Kraushaar's testimony credible and discussed its reasoning at length:

"[M]ost troubling of all to the panel are the inconsistencies in Respondent's testimony and what to the panel can be viewed in the light most favorable to Respondent *only as misrepresentations by Respondent that are devoid of all credibility.*

"With respect to the deed incident, Respondent attempted to furnish a citation to Kansas statutes which are nonexistent. His testimony was also inconsistent in that he testified he knew both parties to the deed had to sign before him, but then later testified he believed a Kansas statute provided otherwise. Respondent's explanation of an oath taken by one party as validating the signature of an absent party lacks credibility. While a minor point, Respondent's story was at variance with that of the sheriff as to whether Respondent first got in touch with the sheriff or the sheriff first got in touch with Respondent.

"With respect to the Philadelphia incident, Respondent would have this panel believe that it was his intent from the first to stay for an additional day and a half to attend 'informal meetings' that involved sitting around with other prosecutors. Respondent would have this panel believe that he spent some seven hours attending these informal sessions. Respondent attempted to retract his earlier statement to agent Kite that he took the extra days as a vacation simply because he wanted to by saying that he considered any time he was out of the office to be a vacation. Respondent also seemed pleased that he did not pay the additional $10 per night double occupancy for his girlfriend, apparently on the theory that the hotel should have thought to charge him rather than feeling an obligation to bring the error to the attention of the hotel officials.

"With respect to the Topeka incident, Respondent would have this panel believe that he intended to drive randomly around pawn shops in Topeka to look for stolen merchandise without any knowledge of even where the pawn shops were located or their hours of operation. Respondent wanted the panel to believe that he expected to further the investigation of a major burglary case by walking around the neighborhood where one of the suspects supposedly lived to see if he could find someone to talk to that knew the suspects. His comments to a KBI agent that he could not remember what he had done that weekend and his attempted explanation to the KBI agent that he had probably been researching something or other at Washburn Law Library differ markedly from his testimony before the panel. Similarly, Respondent's repeated comments that he ate enough at breakfast that he did not eat the rest of the day would seem to have no purpose and added to the lack of credibility surrounding Respondent's testimony.

"Despite testifying that the burglary case Respondent claims he went to Topeka to investigate [as] 'the most significant burglary case in Marshall County in my tenure,' Respondent did not notify any law enforcement officials in Topeka of his trip or investigation, and he did not so advise any Marshall County authorities.

Despite the significance of the case, Respondent says he gave no thought to the problem that if he discovered evidence he would have become a witness and unable to continue as prosecutor in the case. Simply stated, the panel does not find Respondent's explanation of the purpose of his trip to Topeka to be credible.

"Each of these statements by Respondent lack credibility and reflect on his veracity. Standing alone not one of these variations from the truth has any particular significance and could instead possibly be attributed to exaggeration, hyperbole, poor memory, or nervousness on the part of Respondent while testifying. Taken in their totality, bluntly stated, this panel believes Respondent lied under oath while a witness in a disciplinary hearing." (Emphasis added.)

Kraushaar's denial of the factual allegations against him does not compel the finding that there is no clear and convincing evidence of misconduct on his part. See *In re Farmer,* 242 Kan. 296, 299, 747 P. 2d 97 (1987). The panel's findings are supported by clear and convincing evidence.

We must now turn to the violations of the KRPC at issue here. The panel's report did not list findings of specific violations of the KRPC. Neither Kraushaar nor the Disciplinary Administrator discusses the particular rules that may have been violated here. Both parties agree that Rule 8.4 violations were found.

The formal complaint alleged violations of KRPC 8.4 (c), (d), and (g) because of the deed incident. The complaint alleged violations of KRPC 8.4 (c) and (g) as a result of the Topeka and Philadelphia incidents. The alleged violations are not set out in separate counts. Therefore, we must assume that the Disciplinary Administrator brought only one count against Kraushaar alleging violations of Rule 8.4 (c), (d), and (g).

The panel's findings as to violations are unclear. With respect to the deed incident, the panel stated: "[S]uch conduct *may* violate KRPC Rule 8.4 (c), (d), and (g)." (Emphasis added.) The panel did not reference any specific rule violations in its discussion of the remaining two incidents. The panel did state: "These incidents involve dishonesty, misrepresentation, and conduct that is prejudicial to the administration of justice and reflect adversely on the lawyer's fitness to practice law."

Rule 8.4 addresses attorney misconduct, and states in part:

"It is professional misconduct for a lawyer to:

. . . .

"(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice; [or]
. . . .
(g) engage in any other conduct that adversely reflects on the lawyer's fitness to practice law." (1999 Kan. Ct. R. Annot. 399.)

The panel appears to have found that Kraushaar engaged in behavior contrary to all of the above cited rules. However, there is no key language finding Kraushaar in violation, or using the requisite words "clear and convincing evidence." We have examined the alleged violations and make specific findings based on the panel's findings of fact. The question is whether there is clear and convincing evidence in the record to find Kraushaar's conduct in violation of KRPC 8.4(c), (d), and (g). The answer is "yes."

Kraushaar held public office at the time he submitted the requests for reimbursement at issue in the Topeka and Philadelphia incidents. He requested and ultimately received reimbursement for personal expenditures from taxpayer dollars. His actions unquestionably involve dishonesty, fraud, deceit, and misrepresentation in this regard. His conduct is also a breach of the trust of his public office; thus, it reflects adversely on his fitness to practice law. Kraushaar's inconsistent statements to KBI agents and his sworn testimony before the panel were prejudicial to the administration of justice. He either misunderstood or purposely violated his duties as a notary. In either case, his conduct reflects adversely on his fitness to practice law.

The comments to Rule 8.4 state in part:

"Lawyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of attorney." (1999 Kan. Ct. R. Annot. 400.)

Kraushaar's acts involve dishonesty and constitute breach of the trust of his public office and that of an officer of the court. We have no hesitancy in concluding that the record contains clear and convincing evidence that Kraushaar's actions violated Rule 8.4 (c), (d), and (g).

The panel found no factors in mitigation of punishment. It did find several factors in aggravation of punishment. They are:

"a. Prior disciplinary offenses; In 1995 a hearing panel of the Board of Discipline of Attorneys recommended that Respondent be disciplined by public censure. The Kansas Supreme Court overrode the recommendations of the hearing panel and imposed suspension from practice for 2 years, with probation on stipulated conditions of probation. Three justices dissented and would have imposed discipline of 1 year suspension, without probation. [*In re Kraushaar*, 258 Kan. 772, 907 P.2d 836 (1995).]

"b. Dishonest or selfish motive: Respondent's activity in obtaining payment reimbursements from the the county for personal expenses was dishonest.

"c. Pattern of misconduct: Submitting vouchers for excessive payment occurred in two separate matters on two separate occasions.

"d. Multiple offenses: Respondent violated the KRPC in all three of the incidents which are the subject of this report.

"e. Submission of false evidence, false statements, or other deceptive practices during the disciplinary process: Specific instances of false testimony have been pointed out earlier in this panel report and will be discussed subsequently.

"f. Refusal to acknowledge nature of conduct: Respondent admitted that he made a mistake in the notarizing of the deed but has wholly failed to comprehend the nature of misconduct in the other incidents that are the subject of this report.

"g. Substantial experience in the practice of law: At the time of the incidents that are the subject of this report, Respondent had been a practicing lawyer for 10 years."

Kraushaar takes issue with all but the last one of these findings. His arguments are not persuasive. He makes another unsuccessful attempt to argue with the panel's findings of fact. The panel did not find Kraushaar believable. The panel's reasoning is set out above, and it is amply sustained by the evidence. In matters of credibility or conflicting testimony we may defer to the panel's findings. See *In re Carson*, 252 Kan. 399, 406, 845 P. 2d 47 (1993); *State v. Zeigler*, 217 Kan. 748, 755, 538 P.2d 643 (1975).

As for the panel's finding of no mitigating factors, Kraushaar argues that his successful completion of a previously imposed probation is a factor in mitigation of punishment. Kraushaar's first disciplinary proceeding was *In re Kraushaar*, 258 Kan. 772, 907 P.2d 836 (1995). Kraushaar was found to have violated numerous rules of the KRPC. He focuses on the timing of the events at issue here and his prior disciplinary case. Kraushaar argues the incidents here took place before he was disciplined in 1995; thus, his successful 2-year probation shows that suspension from the practice of law is not warranted.

The panel considered and rejected this argument. The panel noted that the act for which Kraushaar was previously disciplined took place in 1993. Kraushaar was not disciplined until 1995. In the meantime, Kraushaar committed the acts at issue here. The panel rejected Kraushaar's mitigation argument because of the timing of events, not in spite of it. The panel reasoned:

"All three of the incidents in the present matter occurred at the time when Respondent knew he was under investigation by the Disciplinary Administrator; if ever there was a time that any lawyer's natural instincts would have suggested to him that it was time to walk a straight and narrow path, the panel believes that it would have been at the time Respondent committed the very acts that are the subject of this hearing report."

In reaching its recommendation of a 2-year suspension from the practice of law, the panel reviewed sections 4.62, 6.1, and 8.2 of the ABA Standards for Imposing Lawyer Sanctions. The panel found that normally Kraushaar's conduct would merit either published censure or suspension. Because of his misrepresentations under oath, his demeanor while testifying, and the aggravating circumstances, it found a 2-year suspension an appropriate discipline.

The deputy Disciplinary Administrator discusses the ABA standards for discipline cited by the panel in his brief. These cited standards are not on point with the conduct in this case. Standard 4.6 involves fraud, deceit, or misrepresentation directed toward a client. Standard 6.1 deals with false statements, fraud, and misrepresentations to a court. Standard 8.0 applies when lawyers violate prior disciplinary orders. The conduct here took place before our decision in Kraushaar's first disciplinary case, *In re Kraushaar*, 258 Kan. 772. The conduct here involves a violation of Kraushaar's duty to the public and his duty as a professional under Standard 7.0.

Standard 7.2 states: "Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system."

By asking the county to pay for personal expenses and pretending they were professional expenses, Kraushaar violated a duty he owed as a professional. The duty is to be honest and maintain the

integrity of his profession and public office. He caused injury to the public by misusing public money.

The incidents at issue here occurred some time ago. However, Kraushaar *at all times* in his legal career, and especially when holding public office, is to conduct himself in according to the ethical standards of this profession. Practicing law is a privilege, not a right. See *In re Phelps*, 226 Kan. 371, 381, 598 P. 2d 180 *cert. denied* 444 U.S. 1045 (1979).

Under the circumstances, we conclude that the appropriate sanction for the above violations is suspension from the practice of law in Kansas for a period of 1 year.

IT IS THEREFORE ORDERED that the respondent, Steven A. Kraushaar, be suspended from the practice of law in the state of Kansas for a period of 1 year from this date.

IT IS FURTHER ORDERED that the respondent comply with the provisions of Supreme Court Rule 218 (1999 Kan. Ct. R. Annot. 250).

IT IS FURTHER ORDERED that this order be published in the official Kansas Reports and the costs of this action be assessed to the respondent.