No. 86,975

In the Matter of LARRY W. WALL, *Respondent*.
(38 P.3d 640)

Opinion filed January 25, 2002.

*Alexander M. Walczak*, deputy disciplinary administrator, argued the cause and was on the formal complaint for petitioner.

*Stephen M. Joseph*, of Wichita, argued the cause and was on the briefs for respondent, and *Larry W. Wall*, respondent, argued the cause pro se.

*Per Curiam*: This is a contested attorney discipline case filed by the office of the Disciplinary Administrator against the respondent, Larry W. Wall, an attorney admitted to the practice of law in the State of Kansas. All exhibits were admitted by agreement of counsel. Other evidence was submitted by stipulation. Respondent was the only witness.

The Hearing Panel concluded that the respondent violated Kansas Rules of Professional Conduct (KRPC) 1.3 (diligence) (2001 Kan. Ct. R. Annot. 323), KRPC 1.4(a) (communication) (2001 Kan. Ct. R. Annot. 334), KRPC 1.15(a) (safekeeping property, separate account) (2001 Kan. Ct. R. Annot. 376), and KRPC 1.15(b) (safekeeping property, promptly deliver funds). The panel recommended public censure.

## Findings of Fact

The respondent takes exceptions to three of the panel's findings of fact and conclusions of law. The panel's findings are as follows (those findings and conclusions to which the respondent takes exception are marked with an asterisk):

"The Disciplinary Administrator and the Respondent stipulated to the following facts:

"1. Larry W. Wall is an attorney at law . . . . His last registration address with the Clerk of the Appellate Courts in Kansas is [in] Wichita, Kansas . . . .

### "DA7956 (Complaint of Katha Helms)

"2. On October 1, 1997, Katha J. Helms was severely injured in an automobile

accident when her automobile left K-99 Highway at a bend between Howard and Severy, Kansas.

"3.   As a result of this accident, on June 7, 1999, Helms retained Greg Lower as her attorney.

"4.   On July 15, 1999, Lower wrote to Helms telling her that he intended to refer her case to Wall. Lower asked Helms to sign a copy of the letter and return it to him if she agreed to the referral.

"5.   On July 15, Lower spoke to Wall concerning Helms' accident and injuries and advised Wall that he planned to recommend to Helms that her case be referred to Wall for representation.

"6.   On July 16, 1999, Lower wrote to Wall that Helms had orally agreed to the referral.

"7.   On August 23, 1999, Lower forwarded Helms' written approval of the referral and Lower's office file to Wall. The file contained the investigation report on Helms' accident, nine other auto accident investigation reports occurring in the same general area as Helms' accident, and several letters concerning requests for accident investigation reports to and from various law enforcement agencies, among other things.

"8.   On October 2, 1999, the [s]tatute of [l]imitation had run in Ms. Helms' case.

"9.   Prior to the referral of the case to Wall, Lower spoke with Jay Pfeiffer, an engineering expert, about investigating the accident.

"10.   On November 10, 1999, Steve Bough, an attorney in the firm of Shamberg, Johnson & Bergman, telephoned Wall's office inquiring about the Helms case. Bough left a telephone message for Wall.

"11.   On reading the telephone message, Wall discovered that the [s]tatute of [l]imitations had run on Helms' claim.

"12.   On December 20, 1999, Steve Bough telephoned Wall again inquiring about the Helms case.

"13.   On January 14 and February 28, 2000, Lynn Johnson, a partner in the firm of Shamberg, Johnson & Bergman, wrote to Wall about the Helms case.

"14.   On February 22, 2000, Wall told Lower that Wall had missed the statute of limitations in Helms' case.

"15.   On February 23, 2000, Wall wrote to Helms stating that the statute of limitations had run in her case and that she could file a claim against him with his malpractice carrier.

"16.   Helms did not receive Wall's letter of February 23, 2000, because Helms had moved and was no longer using the post office box address she provided to Lower.

"17.   On May 15, 2000, Lynn Johnson again wrote to Wall inquiring about Helms' case.

"18.   On June 19, 2000, Helms called Lower. During their telephone conversation, Helms learned for the first time that the statute of limitations had run in her case.

"19.   On June 19, after Helms spoke to Lower, Helms telephoned Wall. Wall was not available and Helms left a message for him.

"20.   On June 23, 2000, Wall returned Helms' telephone call. This telephone conversation was the first personal contact that Wall had with Helms since accepting the referral of her case in July, 1999.

"21.   On June 23, 2000, Helms filed a complaint with the Disciplinary Administrator.

"22.   On July 6, 2000, Wall sent a copy of his February 23, 2000, letter to Helms as his response to Helms' complaint. [We note that the letter in the record is dated February 23, 1999.]"

## "DA7472 (Complaint of Charles Wall)

"23.   Erma B. Wall, a widow, died on January 23, 1998. Erma B. Wall had two children who survived her: Larry Wall [respondent] and Charles Wall.

"24.   Wall drafted his mother's will. Wall was the executor under his mother's will.

"25.   After their mother's death, Wall and his brother decided not to probate their mother's will because of the value of the estate.

"26.   Under the provisions of Mrs. Wall's will, Wall and his brother were to share equally in the estate. Additionally, a statement signed by Mrs. Wall and attached to her will provided for specific personal property bequests to the two brothers.

"27.   On January 23, 1998, three days subsequent to his mother's death, Wall opened a non-interest bearing checking account in his sole name·and, using a power of attorney, transferred a $4,288.70 certificate of deposit owned by his mother, $1,846.32 from his mother's checking account, and $1,618.87 from his mother's savings account into the new account. In subsequent months, Wall also collected other monies coming from his mother's death and deposited those in that non-trust and non-interest bank account.

"28.   The bank account opened by Wall was not labeled as a trust account, but no other money was commingled with the money from his mother's estate. Some money in the account was used to pay Mrs. Wall's funeral expenses, to pay her outstanding debts, and to pay the costs of preparing Mrs. Wall's house for sale. Wall did not withdraw any money from that account for his personal use until all the remaining money in the account was divided between Wall and his brother. None of the money in the account was misused or misappropriated by Wall.

"29.   Wall caused a quitclaim deed dated January 4, 1998, to be filed with the Office of the Register of Deeds. The deed conveyed his mother's house and property to Wall and his brother. The deed was recorded 3 hours and 29 minutes after Mrs. Wall's death on January 23, 1998. Mrs. Wall did not sign the deed. Wall does not remember whether he signed the quitclaim deed for his mother, but Wall did have a durable power of attorney that permitted him to do so prior to her death.

"30. Within a few months after Mrs. Wall's death, Wall and his brother each received his share of their mother's personal property and his share of the proceeds from the sale of their mother's house. Sometime during the period of June 1998, to July 2000, Charles Wall and his attorney made demands for Charles Wall's share of the money held by Wall in the segregated bank account.

"31. On July 17, 2000, sixteen months after the death of Erma B. Wall and following questioning of Wall during an investigation of an ethical complaint made by Charles Wall, Wall distributed to Charles Wall his share of the money held in the checking account. The amount sent to Charles Wall was $1,749.80, which included a small amount of interest. The check was accompanied by a letter from Larry Toomey, who was representing Larry Wall, and a document prepared by Toomey that was an accounting of Mrs. Wall's property.

"32. On July 26, 2000, Toomey again wrote to Charles Wall sending him an additional $666.99 representing 10 percent annual interest on his share of the remaining money from the bank account and a credit for a copying expense previously charged equally to Larry Wall and Charles Wall.

## "C. STIPULATED VIOLATIONS

"The respondent stipulated that his conduct violated the following rules:

"Rule 1.3, Diligence. By missing the statute of limitations in the Helms case, Respondent was not diligent.

"Rule. 1.4, Communication. By failing to communicate with Ms. Helms, the Respondent violated Rule 1.4(a).

"Rule 1.15 (a). Safekeeping Property. Respondent violated Rule 1.15(a), dealing with the safekeeping of property, by not identifying as a trust account the account into which he deposited his mother's funds. *Respondent also stipulated to a violation of Rule 1.15(b), in that funds from the house closing upon the sale of his mother's house were not promptly delivered to the Respondent's brother.

## "D. CONCLUSIONS OF LAW

"Based upon the Respondent's stipulations in the above findings of fact, the hearing panel concludes that the Respondent violated Kansas Rules of Professional Conduct 1.3, 1.4(a), 1.15(a) and 1.15(b), as follows:

"1. Attorneys must act with reasonable diligence and promptness in representing their clients, as required by KRPC 1.3. In the Katha Helms complaint, Respondent received the files and materials in sufficient time for him to act to avoid the tolling of the statute of limitations. Respondent's failure to act with reasonable diligence and promptness resulted in the barring of any claim which Katha Helms may have had for recovery.

"2. Lawyers are required to keep clients reasonably informed about the [status] of the matter handled by the attorney, as required by Rule 1.4. Respondent failed to communicate with Katha Helms following the receipt of her file, and it was not until sometime following the lapse of the statute of limitations that Respondent finally communicated with his client, and such failure of communication constituted a violation of Rule 1.4(a).

"3. Lawyers are required to hold the property of clients or third persons that is in a lawyer's possession in connection with the representation separate from the lawyer's own property. The client's property is to be identified and appropriately safeguarded. Respondent failed to identify the account as a trust account and maintained the account solely in his own name.

*"4. Upon receiving funds or other property in which a client or third party has an interest, a lawyer is required by Rule 1.15(b) promptly to notify the client or the third person. Respondent failed to notify his brother and failed to pay his brother's share of the funds from the sale of their mother's house in a prompt fashion.

"The Disciplinary Administrator urges that Respondent additionally violated Rule 8.1(a) by knowingly making a false statement of material fact and Rule 8.4(c), by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, both relating to a letter written by the Respondent which the Disciplinary Administrator argues states that Katha Helms' file was sent to another lawyer for handling. The panel is not persuaded by the evidence and therefore declines to find that Respondent's conduct violated either Rule 8.1 or 8.4.

"Respondent stipulated that he used a power of attorney, following his mother's death, to obtain the transfer of funds from his mother's accounts over to a new bank account established by the Respondent. Respondent also testified that subsequent to his mother's death he used the same power of attorney to transfer title to a motor vehicle to his brother. Under Kansas law, a power of attorney terminates upon the death of the principal, and upon the death of the principal, the attorney in fact has no authority whatever to act as agent on behalf of the principal. The panel is of the opinion that Rule 4.1, Truthfulness in Statements to Others, may have been violated by this conduct by Respondent. Rule 4.1 states that in the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person or fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a fraudulent act by a client. In using the terminated power of attorney to transfer the funds and obtain the transfer of the motor vehicle title, Respondent arguably violated Rule 4.1. For reasons more fully explained in its recommendations, the panel declines to find a violation of Rule 4.1.

## "E. RECOMMENDATIONS

"The Disciplinary Administrator urges the panel to discipline Respondent by a definite suspension from practice, followed by suspension of that discipline pursuant to the terms of a proposed written plan of probation submitted by the Respondent at the time of hearing. The Respondent through counsel urges that the discipline imposed should be a suspension of imposition of discipline for a period of two years to determine whether Respondent abides by the terms of his proposed written plan of probation.

"In the Katha Helms complaint, Respondent missed the statute of limitations, and the panel finds that Respondent at all times has admitted that error. The

evidence indicates that the missing of the statute of limitations was a mistake caused by how the Respondent's calendar system was maintained. The panel finds that the mistake was not caused by lack of diligence or disregard for a client matter by the Respondent. The panel is of the opinion that lawyers can make mistakes which may constitute malpractice and subject the attorney to a potential claim for damages without those mistakes constituting a violation of the Kansas Rules of Professional Conduct. The panel expresses no opinion as to whether it would have found a violation of Rule 1.3 in the absence of stipulation by the parties, but in view of the stipulation of the parties, the panel accepts the stipulation of violation of Rule 1.3.

"With respect to the violation of Rule 1.4, lack of communication, the panel is of the opinion that the lack of communication was at least in part caused by the mistake made when the matter was fixed on Respondent's calendar. There is no suggestion that the Respondent ignored or failed to communicate with Katha Helms, other than by virtue of the mistake that led Respondent to believe he had many months to work on Respondent's case. The panel therefore accepts the stipulated violation of Rule 1.4 without expressing an opinion as to whether it would independently have found a violation.

"The violations of Rule 1.15 are troubling because the violations show the all-too-frequent pattern of a lawyer who has confined his practice to an area of narrow specialization and then upon the death of a close relative seems to believe that he is qualified to act with respect to the decedent's estate. The evidence did not so indicate in clear language, but inferences could be drawn from Respondent's testimony that he may have been unaware that his mother's durable power of attorney terminated upon her death. Similarly, Respondent appeared ignorant about the handling of his mother's funds. Respondent testified that his mother's estate represented the only will which he had drawn and the only estate which he handled, and the truth of those statements was confirmed by Respondent's inept attempts to deal with and handle the estate. Respondent attempted to practice in an area in which he was unfamiliar, and as a lawyer with 30 years of experience he should have known that.

"In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereafter 'Standards') as follows: Rule 4.14 deals with failure to preserve a client's property and states, 'Admonition is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client.'

"Standard 4.43 deals with lack of diligence and states, 'Reprimand is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.'

### "Matters in Aggravation

"a. *Prior Disciplinary Offenses*. Respondent was previously disciplined January

12, 2001 for a violation of Rule 5.1, Responsibilities of Partner or Supervisory Lawyer.

"b. *Pattern of Misconduct*. Both of these matters occurred about the same time and constitute a pattern.

"c. *Multiple Offenses*. There were multiple offenses of the KRPC.

*"d. *Vulnerability of Victim*. Katha Helms, as the victim of a serious personal injury, was obviously incapable of handling restitution and compensation on her own behalf and was therefore vulnerable.

"e. *Substantial Experience in the Practice of Law*. As a practitioner with more than 30 years of experience, Respondent is experienced in the practice of law.

### "Matters in Mitigation

"a. *Absence of Dishonest or Selfish Motive*. The panel finds that there was no dishonest or selfish motive.

"b. *Personal or Emotional Problems*. The panel finds that during this period of time Respondent was undergoing martial difficulties, he was obviously upset by his mother's death, and he was suffering from alcoholism.

"c. *Cooperation During Hearing*. The Respondent appeared cooperative at the hearing, and the panel was advised by the Disciplinary Administrator that Respondent has been cooperative throughout the disciplinary proceeding.

"d. *Mental Disability or Chemical Dependency*. Respondent was suffering from alcoholism.

"e. *Remorse*. Respondent exhibit[ed] remorse at the time of the hearing which the panel believed was genuine.

"Additionally, the panel finds that with respect to the Wall complaint, there was no harm caused by Respondent's conduct. Previous family disagreements and feuds may have contributed both to the action of the complainant and to Respondent's response to his brother's demands, which would be unlikely to affect Respondent's practice of law as regards unrelated third parties. With respect to the complaint of Katha Helms, there was evidence to the effect that Ms. Helms' personal injury action might not have been a valid claim; suffice it to say that to the extent Ms. Helm's action may have been successful, she would appear to have an action against Respondent for malpractice.

"It is the recommendation of [the] hearing panel that Respondent be disciplined by public censure.

"Costs are assessed against the Respondent in such amount as shall be certified by the Office of the Disciplinary Administrator."

### The following was added to the panel's report:

### "ADDENDUM TO FINAL HEARING REPORT

"This hearing on this matter was held March 9, 2001. The preliminary draft of the hearing report was completed and circulated to the panel members for comment on March 14. The final draft was completed and sent for signature on March 23.

"On March 15, six days following the hearing and after the preliminary draft of the hearing report had already been mailed, the panel received two letters submitted by the Respondent, apparently intended as part of his evidence in mitigation.

"On March 29, the panel received some 15 additional letters, ranging in date from March 14 through March 27. These letters were also apparently submitted as further evidence in mitigation.

"The panel wishes to make two points regarding the submission of materials following the close of hearing:

"1. *Permission and Date.* Permission should be obtained by a party prior to the close of the hearing to submit anything into evidence, whether in mitigation or otherwise, subsequent to the close of the hearing. A firm date should also be fixed by which time all documents to be submitted will be received by the panel. The panel has tried to be prompt in rendering its opinion; the panel now received two separate mailings of matters in mitigation, and as the result the panel has been required to review these matters and reconsider the evidence submitted in mitigation.

"In the present matter, the panel still does not know whether it has received all of the matters in mitigation which the Respondent wishes to submit. The panel does not regard it as being in the best interest of any Respondent for the panel to hold up indefinitely on rendering its written opinion with the expectation that someday the Respondent may wish to submit further evidence in mitigation.

"2. *Deliberative Nature of Opinion.* The Board of Discipline for Attorneys is intentionally structured by our Supreme Court to sit in deliberative bodies of three to hear the evidence and to reach a deliberative decision based upon the counsel of all three of the members. Following the conclusion of hearing, panel members meet to deliberate and express their ideas and opinions and arrive at a reasoned conclusion that represents the judgment of all three panel members. Panel members set aside time for this purpose so that undivided attention can be focused on the evidence presented at the hearing.

"The benefit of this deliberative process is defeated by Respondents who submit documents to the panel members following the conclusion of the hearing.

"To enable the deliberative nature of the hearing panel to be fulfilled, matters in mitigation must be submitted by [no] later than the close of the hearing unless other arrangements are permitted by the hearing panel.

"We have reviewed all of the evidence in mitigation and find that no revision of our previously submitted final hearing report is required."

## Respondent's Exceptions

The respondent takes exception to three statements made by the hearing panel in the final hearing report. These exceptions present three issues for review: (1) Did the panel err by finding that the respondent violated KRPC 1.15(b)? (2) Did the panel err in finding

that Katha Helms was "vulnerable" within the meaning of Section 9.22(h) (aggravating factors) of the ABA Standards for Imposing Lawyer Sanctions (1991)? and (3) Was the panel's recommended discipline excessive?

The applicable standards of review are as follows:

" 'In disciplinary matters, we have a duty to examine the evidence and determine for ourselves the judgment to be entered. Although the report of the disciplinary panel is advisory only, it will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicted testimony. [Citations omitted.] We apply these rules in considering the evidence, the findings of the panel, and the arguments of the parties in making our determination of whether violations of KRPC exist, and, if they do, deciding upon the appropriate discipline to be imposed.' " *In re Zimmerman*, 270 Kan. 855, 858, 19 P.3d 160 (2001) (quoting *In re Berg*, 264 Kan. 254, 269, 955 P.2d 1240 [1998]).

## KRPC 1.15(b)

The respondent claims that in the final hearing report, the hearing panel incorrectly said that he stipulated "that funds from the house closing upon the sale of his mother's house were not promptly delivered to the Respondent's brother." He also claims that in the "Conclusions of Law" section of the report, the panel incorrectly said, "Respondent failed to notify his brother and failed to pay his brother's share of the funds from the sale of their mother's house in a prompt fashion."

The respondent contends that his brother Charles Wall was paid his share of the house sale proceeds directly by the closing agent. The respondent's testimony before the panel confirms this assertion. The Disciplinary Administer concedes that the quoted portions stated above do not accurately represent the conduct that violated KRPC 1.15(b) to which the respondent stipulated. However, the Disciplinary Administrator points out that at the hearing, the respondent admitted violating KRPC 1.15(b). Thus, the Disciplinary Administrator argues that the errors are clerical, harmless, and of no effect.

At the hearing, the respondent's counsel said:

"The other violation that we think probably occurred and we agree occurred with regard to 1.15 subsection(B) is this. The sequence of events that took place is relatively simple and we think and *agree that it leads to a conclusion that Mr. Wall did not properly deliver to his brother his share of the funds in that segregated account.* . . . There's been no claim by anybody that any of the property or proceeds from the sale of the house were delayed or not distributed appropriately." (Emphasis added.)

Clarification developed during oral argument before this court. The Deputy Disciplinary Administrator said:

"With respect to the first exception, the respondent is correct. The final hearing report inaccurately states in the stipulations of violations and the conclusions of law, that the respondent did not provide the proceeds of the sale of the house to his brother. That's inaccurate. What the final hearing report should state is that he did not provide in a timely manner the proceeds of the mother's checking and savings account."

The panel accepted the respondent's admission to the violation of KRPC 1.15(b). The respondent points out that the funds distributed late to Charles totaled $1,687.05, plus interest. The respondent later paid him an additional $666.99, representing 10% annual interest on his portion of the remaining money from the bank account and a credit for a previous copying expense. The total amount of cash assets held by the respondent had totaled $7,753.93, out of which expenses were eventually paid. After Charles' complaint was filed, counsel was engaged to represent the respondent. The respondent's counsel advised him to do nothing while the investigation was ongoing. Then, John Seeber, the attorney investigating Charles' complaint, "made it crystal clear that he seriously considered this [nondistribution] to be a violation," so the respondent decided to go against his counsel's advice and distribute Charles' portion.

Despite the panel's technical error concerning distribution of the funds from the sale of the respondent's mother's house, the respondent acknowledged that he violated KRPC 1.15(b) by failing to distribute Charles' share of the segregated account. See *In re Rickman*, 266 Kan. 658, 663, 972 P.2d 759 (1999) (recognizing a technical error in the panel's recitation of a date, but finding clear and convincing evidence to support the panel's findings). We find

there is clear and convincing evidence supporting the panel's finding that the respondent violated 1.15(b).

### "Vulnerable" victim

Next, the respondent argues that the panel incorrectly found "Katha Helms, as the victim of a serious personal injury, was obviously incapable of handling restitution and compensation on her own behalf and was therefore vulnerable." The ABA Standards permit consideration of the "vulnerability of [the] victim" as an aggravating factor:

"*Aggravation*

"9.21 *Definition.* Aggravation or aggravating circumstances are any considerations, or factors that may justify an increase in the degree of discipline to be imposed.

"9.22 *Factors which may be considered in aggravation.* Aggravating factors include:

. . . .

(h) vulnerability of victim . . . ."

The respondent argues that Helms was not permanently mentally or physically incapacitated by her injuries. However, he notes that she had "a metal jaw, a ruined right hip, and . . . will have trouble having children." The respondent does not question that Helms was seriously and permanently injured in her accident, but he contends that her injuries were not the type that would make her especially vulnerable to the misconduct of a lawyer.

The Disciplinary Administrator acknowledges that ABA Standard § 9.22(h) does not define the word "vulnerability." He argues that the application of the term is to be determined by the specific facts of a case. At the hearing, the Disciplinary Administrator argued that Helms was a "vulnerable" person:

"Vulnerability of the victim, I think that applies only to Katha Hebb/Helms. She was vulnerable. She clearly . . . did not know the statute of limitations had been missed until June 19th of 1999 when she had the conversation with attorney Greg Lower and then she telephoned the respondent. But up until that time, she was trusting her attorney that her attorney was going to represent her and she was injured."

In addition, the Disciplinary Administrator argued that he did not think Helms was very "worldly" and that, although he was

unsure of her education level, he did not think she was well-educated.

The respondent argued that "vulnerability" means an "uneducated" person, "somebody who has a mental or emotional problem, someone who is very old, [or] someone who is very young." He observes that the Commentary to ABA Standard § 9.22, p. 49, cites *People v. Lanza*, 200 Colo. 241, 613 P.2d 337 (1980), as an example of "vulnerability of victim." Although the term "vulnerable" was not used in the opinion, the *Lanza* court observed that one of the victims was a widow in her early seventies, who was indigent, somewhat feeble, and had a poor grasp of the English language. 200 Colo. at 242. The respondent also cites cases from other jurisdictions. See *People v. Crist*, 948 P.2d 1020, 1020-21 (Colo. 1997) (lawyer abandoned clients in criminal, juvenile, and civil cases, and some of those clients were "vulnerable"); *In re Basile*, 714 So. 2d 687, 688 (La. 1998) (victim of lawyer's misconduct included lawyer's own father); *Matter of Discipline of Tanner*, 960 P.2d 399, 402 (Utah 1998) (client was vulnerable due to his adversarial relationship with police, which may have led lawyer to believe client would avoid reporting lawyer's misconduct).

The Disciplinary Administrator references our disciplinary opinions in which the panel has found clients to be vulnerable. See *In re Coggs*, 270 Kan. 381, 401, 14 P.3d 1123 (2000) (client was 90 years old and placed her trust in attorney who prepared her will and trust); *In re Trickey*, 268 Kan. 835, 838, 999 P.2d 964 (2000) ("all bankruptcy clients are financially vulnerable"); *In re Cole*, 268 Kan. 171, 175, 991 P.2d 422 (1999) (client did not have experience in the administration of a decedent's estate matters and relied completely on the advice and judgment of the attorney); *In re Christians*, 267 Kan. 240, 243, 978 P.2d 910 (1999) (client unsophisticated in bankruptcy matters and trusted attorney's professional expertise); *In re Scimeca*, 265 Kan. 742, 747, 962 P.2d 1080 (1998) (unsophisticated consumers of limited means); *In re Anderson*, 264 Kan. 758, 760, 956 P.2d 1330 (1998) (indigent clients); *In re Berg*, 264 Kan. 254, 278, 955 P.2d 1240 (1998) (emotionally distraught clients); *In re Seck*, 258 Kan. 530, 533, 905 P.2d 122 (1995) (client sustained permanent injuries and was not skilled or experienced in

business matters or in handling litigation). However, none of the cited cases either involved a statute of limitations bar or an objection to the "vulnerability" finding.

Helms relied upon her attorney, but was not informed that her claim was barred until months after the statute of limitations had run. The problem, as we see it, with applying vulnerability as an aggravating factor here is twofold. First, every personal injury plaintiff relies on counsel to protect his or her claim from being barred by the statute of limitations. Second, Helms did not appear before the panel. Thus, a traditional element of factfinding, listening, and observing as the witness testifies, is missing here. Helms' complaint was submitted by stipulation and agreement. We do not believe vulnerability is an appropriate aggravating factor here. Our conclusion is limited to the facts of this case. Our holding on vulnerability, however, does not affect our endorsement of the panel's recommendation on discipline.

## Recommended discipline

The hearing panel recommended that the respondent be disciplined by public censure. The respondent recognizes negligence in handling the Helms matter and ineptness in the handling of his mother's estate. However, he contends that nobody suffered injury. The Disciplinary Administrator disagrees and argues that the respondent caused significant injury to his client, the public, the legal system, and the legal profession.

ABA Standard § 4.43 deals with lack of diligence and says:

"Reprimand is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client."

ABA Standard § 2.5 provides: "Reprimand, also known as censure or public censure, is a form of public discipline which declares the conduct of the lawyer improper, but does not limit the lawyer's right to practice." The Commentary to ABA Standard § 2.5 includes the following:

"A reprimand is appropriate in cases where the lawyer's conduct, although violating ethical standards, is not serious enough to warrant suspension of disbarment. . . . A reprimand serves the useful purpose of identifying lawyers who

have violated ethical standards, and, if accompanied by a published opinion, educates members of the bar as to these standards." p. 22.

The respondent argues that ABA Standard § 2.6 (admonition) provides a more appropriate form of discipline. The Commentary to § 2.6 says, in pertinent part:

"Admonition is the least serious of the formal disciplinary sanctions, and is the only private sanction. . . . Because imposing an admonition will not inform members of the public about the lawyer's misconduct, admonition should be used only when the lawyer is negligent, when the ethical violation results in little or no injury to a client, the public, the legal system, or the profession, and when there is little or no likelihood of repetition. Relying on these criteria should help protect the public while, at the same time, avoid damage to a lawyer's reputation when future ethical violations seem unlikely."

The Disciplinary Administrator notes that the success of Helms' legal cause of action, had it gone to trial, is unknown. However, she clearly suffered serious injuries in her accident. As the Disciplinary Administrator observes, the respondent failed to fully investigate the merit of Helms' case, failed to keep her informed, and failed to meet the statute of limitations deadline.

The statute ran on October 2, 1999. In his February 23, 2000, letter to Helms, the respondent said he was not convinced that she had a good claim because "it appears from the [accident] report that [Helms] simply missed the curve." However, the respondent acknowledged that he did not have Helms' version of events. At the disciplinary hearing, he admitted that he did not know if she "had a case" and had not analyzed the matter properly.

With regard to Charles Wall's complaint, the Disciplinary Administrator notes that the respondent showed an unwillingness to distribute Charles' portion of their mother's savings and checking accounts and certificate of deposit for 2 years. The distribution was finally made during the investigation of Charles' complaint. The panel concluded that there was no harm caused by the respondent's conduct with respect to Charles' complaint.

Despite the lack of injury to Charles, there was significant potential injury to Helms. In addition, respondent's admission of his four violations of the KRPC supports published censure.

We find that the panel's findings and conclusions as modified herein are supported by clear and convincing evidence.

Respondent suggests that if we publish this opinion we omit his name. No precedent is cited in support of that type of opinion. We reject the suggestion.

IT IS THEREFORE ORDERED that Larry W. Wall, be disciplined by published censure in accordance with Supreme Court Rule 203(a)(3) (2001 Kan. Ct. R. Annot. 224).

IT IS FURTHER ORDERED that the costs of this proceeding be assessed to the respondent, and that this opinion be published in the official Kansas Reports.

DAVIS, J., not participating.

BRAZIL, Chief Judge Retired, assigned.